BELLOTTI, ATTORNEY GENERAL OF MASSACHU-
SETTS, ET AL. v. BAIRD ET AL.

No. 78–329.  Argued February 27, 1979—Decided July 2, 1979*

---

*Together with No. 78–330, *Hunerwadel* v. *Baird et al.*, also on appeal
from the same court.

Powell, J., announced the judgment of the Court and delivered an opinion, in which Burger, C. J., and Stewart and Rehnquist, JJ., joined.

Rehnquist, J., filed a concurring opinion, *post,* p. 651. Stevens, J., filed an opinion concurring in the judgment, in which Brennan, Marshall, and Blackmun, JJ., joined, *post,* p. 652. White, J., filed a dissenting opinion, *post,* p. 656.

*Garrick F. Cole,* Assistant Attorney General of Massachusetts, argued the cause for appellants in No. 78–329. With him on the briefs were *Francis X. Bellotti,* Attorney General, *pro se,* and *Michael B. Meyer* and *Thomas R. Kiley,* Assistant Attorneys General. *Brian A. Riley* argued the cause for appellant in No. 78–330. With him on the brief was *Thomas P. Russell.*

*Joseph J. Balliro* argued the cause for appellees in both cases. With him on the brief was *Joan C. Schmidt. John H. Henn* also argued the cause for appellees in both cases. With him on the brief were *Scott C. Moriearty, Sandra L. Lynch, Loyd M. Starrett,* and *John Reinstein.*†

Mr. Justice Powell announced the judgment of the Court and delivered an opinion, in which The Chief Justice, Mr. Justice Stewart, and Mr. Justice Rehnquist joined.

These appeals present a challenge to the constitutionality of a state statute regulating the access of minors to abortions. They require us to continue the inquiry we began in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976), and *Bellotti* v. *Baird,* 428 U. S. 132 (1976).

---

†*Stuart D. Hubbell* and *Robert A. Destro* filed a brief for the Catholic League for Religious and Civil Rights et al. as *amici curiae* urging reversal in No. 78–329.

*Eve W. Paul, Harriet F. Pilpel,* and *Sylvia A. Law* filed a brief for the Planned Parenthood Federation of America, Inc., et al. as *amici curiae* urging affirmance in both cases.

Briefs of *amici curiae* were filed by *Victor G. Rosenblum, Dennis J. Horan,* and *John D. Gorby* in both cases for Americans United for Life, Inc., et al.; and by *George E. Reed* and *Patrick F. Geary* in No. 78–329 for the United States Catholic Conference.

I

A

On August 2, 1974, the Legislature of the Commonwealth of Massachusetts passed, over the Governor's veto, an Act pertaining to abortions performed within the State. 1974 Mass. Acts, ch. 706. According to its title, the statute was intended to regulate abortions "within present constitutional limits." Shortly before the Act was to go into effect, the class action from which these appeals arise was commenced in the District Court[1] to enjoin, as unconstitutional, the provision of the Act now codified as Mass. Gen. Laws Ann., ch. 112, § 12S (West Supp. 1979).[2]

Section 12S provides in part:

"If the mother is less than eighteen years of age and has not married, the consent of both the mother and her parents [to an abortion to be performed on the mother] is required. If one or both of the mother's parents refuse such consent, consent may be obtained by order of a judge of the superior court for good cause shown, after such hearing as he deems necessary. Such a hearing will not require the appointment of a guardian for the mother. If one of the parents has died or has deserted his or her family, consent by the remaining parent is sufficient. If both parents have died or have deserted their family, consent of the mother's guardian or other

---

[1] The court promptly issued a restraining order which remained in effect until its decision on the merits. Subsequent stays of enforcement were issued during the complex course of this litigation, with the result that Mass. Gen. Laws Ann., ch. 112, § 12S (West Supp. 1979), never has been enforced by Massachusetts.

[2] As originally enacted, § 12S was designated as § 12P of chapter 112. In 1977, the provision was renumbered as § 12S, and the numbering of subdivisions within the section was eliminated. No changes of substance were made. We shall refer to the section as § 12S throughout this opinion.

person having duties similar to a guardian, or any person who had assumed the care and custody of the mother is sufficient. The commissioner of public health shall prescribe a written form for such consent. Such form shall be signed by the proper person or persons and given to the physician performing the abortion who shall maintain it in his permanent files."

Physicians performing abortions in the absence of the consent required by § 12S are subject to injunctions and criminal penalties. See Mass. Gen. Laws Ann., ch. 112, §§ 12Q, 12T, and 12U (West Supp. 1979).

A three-judge District Court was convened to hear the case pursuant to 28 U. S. C. § 2281 (1970 ed.), repealed by Pub. L. 94–381, § 1, 90 Stat. 1119.[3] Plaintiffs in the suit, appellees in both the cases before us now, were William Baird; Parents Aid Society, Inc. (Parents Aid), of which Baird is founder and director; Gerald Zupnick, M. D., who regularly performs abortions at the Parents Aid clinic; and an unmarried minor, identified by the pseudonym "Mary Moe," who, at the commencement of the suit, was pregnant, residing at home with her parents, and desirous of obtaining an abortion without informing them.[4]

Mary Moe was permitted to represent the "class of unmarried minors in Massachusetts who have adequate capacity to give a valid and informed consent [to abortion], and who do not wish to involve their parents." *Baird* v. *Bellotti,* 393 F. Supp. 847, 850 (Mass. 1975) (*Baird I*). Initially there was some confusion whether the rights of minors who wish abortions without parental involvement but who lack "adequate capacity" to give such consent also could be adjudicated in

---

[3] The proceedings before the court and the substance of its opinion are described in detail in *Bellotti* v. *Baird,* 428 U. S. 132, 136–143 (1976).

[4] Three other minors in similar circumstances were named in the complaint, but the complaint was dismissed as to them for want of proof of standing. That decision has not been challenged on appeal.

the suit. The District Court ultimately determined that Dr. Zupnick was entitled to assert the rights of these minors. See *Baird* v. *Bellotti,* 450 F. Supp. 997, 1001, and n. 6 (Mass. 1978).[5]

Planned Parenthood League of Massachusetts and Crittenton Hastings House & Clinic, both organizations that provide counseling to pregnant adolescents, and Phillip Stubblefield, M. D. (intervenors),[6] appeared as *amici curiae* on behalf of the plaintiffs. The District Court "accepted [this group] in a status something more than *amici* because of reservations about the adequacy of plaintiffs' representation [of the plaintiff classes in the suit]." *Id.,* at 999 n. 3.

Defendants in the suit, appellants here in No. 78–329, were the Attorney General of Massachusetts and the District Attorneys of all counties in the State. Jane Hunerwadel was permitted to intervene as a defendant and representative of the class of Massachusetts parents having unmarried minor daughters who then were, or might become, pregnant. She and the class she represents are appellants in No. 78–330.[7]

Following three days of testimony, the District Court issued an opinion invalidating § 12S. *Baird I, supra.* The court rejected appellees' argument that all minors capable of becoming pregnant also are capable of giving informed consent

---

[5] Appellants argue that these "immature" minors never were before the District Court and that the court's remedy should have been tailored to grant relief only to the class of "mature" minors. It is apparent from the District Court's opinions, however, that it considered the constitutionality of § 12S as applied to all pregnant minors who might be affected by it. We accept that the rights of this entire category of minors properly were subject to adjudication.

[6] In 1978, the District Court permitted postjudgment intervention by these parties, who now appear jointly before this Court as intervenor-appellees.

[7] As their positions are closely aligned, if not identical, appellants in Nos. 78–329 and 78–330 are hereinafter referred to collectively as appellants.

to an abortion, or that it always is in the best interests of a minor who desires an abortion to have one. See 393 F. Supp., at 854. But the court was convinced that "a substantial number of females under the age of 18 are capable of forming a valid consent," *id.,* at 855, and "that a significant number of [these] are unwilling to tell their parents." *Id.,* at 853.

In its analysis of the relevant constitutional principles, the court stated that "there can be no doubt but that a female's constitutional right to an abortion in the first trimester does not depend upon her calendar age." *Id.,* at 855–856. The court found no justification for the parental consent limitation placed on that right by § 12S, since it concluded that the statute was "cast not in terms of protecting the minor, . . . but in recognizing independent rights of parents." *Id.,* at 856. The "independent" parental rights protected by § 12S, as the court understood them, were wholly distinct from the best interests of the minor.[8]

## B

Appellants sought review in this Court, and we noted probable jurisdiction. *Bellotti* v. *Baird,* 423 U. S. 982 (1975). After briefing and oral argument, it became apparent that § 12S was susceptible of a construction that "would avoid or substantially modify the federal constitutional challenge to the statute." *Bellotti* v. *Baird,* 428 U. S. 132, 148 (1976) (*Bellotti I*). We therefore vacated the judgment of the District Court, concluding that it should have abstained and certified to the Supreme Judicial Court of Massachusetts appropriate questions concerning the meaning of § 12S, pursuant to exist-

---

[8] One member of the three-judge court dissented, arguing that the decision of the majority to allow Mary Moe to proceed in the case without notice to her parents denied them their parental rights without due process of law, and that § 12S was consistent with the decisions of this Court recognizing the propriety of parental control over the conduct of children. See 393 F. Supp., at 857–865.

ing procedure in that State.  See Mass. Sup. Jud. Ct. Rule 3:21.

On remand, the District Court certified nine questions to the Supreme Judicial Court.[9]  These were answered in an

[9] The nine questions certified by the District Court, with footnotes omitted, are as follows:

"1. What standards, if any, does the statute establish for a parent to apply when considering whether or not to grant consent?

"a) Is the parent to consider 'exclusively . . . what will serve the child's best interest'?

"b) If the parent is not limited to considering exclusively the minor's best interests, can the parent take into consideration the 'long-term consequences to the family and her parents' marriage relationship'?

"c) Other?

"2. What standard or standards is the superior court to apply?

"a) Is the superior court to disregard all parental objections that are not based exclusively on what would serve the minor's best interests?

"b) If the superior court finds that the minor is capable, and has, in fact, made and adhered to, an informed and reasonable decision to have an abortion, may the court refuse its consent based on a finding that a parent's, or its own, contrary decision is a better one?

"c) Other?

"3. Does the Massachusetts law permit a minor (a) 'capable of giving informed consent,' or (b) 'incapable of giving informed consent,' 'to obtain [a court] order without parental consultation'?

"4. If the court answers any of question 3 in the affirmative, may the superior court, for good cause shown, enter an order authorizing an abortion, (a), without prior notification to the parents, and (b), without subsequent notification?

"5. Will the Supreme Judicial Court prescribe a set of procedures to implement c. 112, [§ 12S] which will expedite the application, hearing, and decision phases of the superior court proceeding provided thereunder? Appeal?

"6. To what degree do the standards and procedures set forth in c. 112, § 12F (Stat. 1975, c. 564), authorizing minors to give consent to medical and dental care in specified circumstances, parallel the grounds and procedures for showing good cause under c. 112, [§ 12S]?

"7. May a minor, upon a showing of indigency, have court-appointed counsel?

"8. Is it a defense to his criminal prosecution if a physician performs an abortion solely with the minor's own, valid, consent, that he reasonably,

opinion styled *Baird* v. *Attorney General,* 371 Mass. 741, 360 N. E. 2d 288 (1977) (*Attorney General*). Among the more important aspects of § 12S, as authoritatively construed by the Supreme Judicial Court, are the following:

1. In deciding whether to grant consent to their daughter's abortion, parents are required by § 12S to consider exclusively what will serve her best interests. See *id.,* at 746–747, 360 N. E. 2d, at 292–293.

2. The provision in § 12S that judicial consent for an abortion shall be granted, parental objections notwithstanding, "for good cause shown" means that such consent shall be granted if found to be in the minor's best interests. The judge "must disregard all parental objections, and other considerations, which are not based exclusively" on that standard. *Id.,* at 748, 360 N. E. 2d, at 293.

3. Even if the judge in a § 12S proceeding finds "that the minor is capable of making, and has made, an informed and reasonable decision to have an abortion," he is entitled to withhold consent "in circumstances where he determines that the best interests of the minor will not be served by an abortion." *Ibid.,* 360 N. E. 2d, at 293.

4. As a general rule, a minor who desires an abortion may not obtain judicial consent without first seeking both parents' consent. Exceptions to the rule exist when a parent is not available or when the need for the abortion constitutes " 'an emergency requiring immediate action.' " [10] *Id.,* at 750, 360 N. E. 2d, at 294. Unless a parent is not available, he must be notified of any judicial proceedings brought under § 12S. *Id.,* at 755–756, 360 N. E. 2d, at 297.

---

and in good faith, though erroneously, believed that she was eighteen or more years old or had been married?

"9. Will the Court make any other comments about the statute which, in its opinion, might assist us in determining whether it infringes the United States Constitution?"

[10] Section 12S itself dispenses with the need for the consent of any parent who "has died or has deserted his or her family."

5. The resolution of § 12S cases and any appeals that follow can be expected to be prompt. The name of the minor and her parents may be held in confidence. If need be, the Supreme Judicial Court and the superior courts can promulgate rules or issue orders to ensure that such proceedings are handled expeditiously. *Id.*, at 756–758, 360 N. E. 2d, at 297–298.

6. Massachusetts Gen. Laws Ann., ch. 112, § 12F (West Supp. 1979), which provides, *inter alia,* that certain classes of minors may consent to most kinds of medical care without parental approval, does not apply to abortions, except as to minors who are married, widowed, or divorced. See 371 Mass., at 758–762, 360 N. E. 2d, at 298–300. Nor does the State's common-law "mature minor rule" create an exception to § 12S. *Id.*, at 749–750, 360 N. E. 2d, at 294. See n. 27, *infra.*

## C

Following the judgment of the Supreme Judicial Court, appellees returned to the District Court and obtained a stay of the enforcement of § 12S until its constitutionality could be determined. *Baird* v. *Bellotti*, 428 F. Supp. 854 (Mass. 1977) (*Baird II*). After permitting discovery by both sides, holding a pretrial conference, and conducting further hearings, the District Court again declared § 12S unconstitutional and enjoined its enforcement. *Baird* v. *Bellotti*, 450 F. Supp. 997 (Mass. 1978) (*Baird III*). The court identified three particular aspects of the statute which, in its view, rendered it unconstitutional.

First, as construed by the Supreme Judicial Court, § 12S requires parental notice in virtually every case where the parent is available. The court believed that the evidence warranted a finding "that many, perhaps a large majority of 17-year olds are capable of informed consent, as are a not insubstantial number of 16-year olds, and some even younger." *Id.*, at 1001. In addition, the court concluded that it would not be in

the best interests of some "immature" minors—those incapable of giving informed consent—even to inform their parents of their intended abortions. Although the court declined to decide whether the burden of requiring a minor to take her parents to court was, *per se,* an impermissible burden on her right to seek an abortion, it concluded that Massachusetts could not constitutionally insist that parental permission be sought or notice given "in those cases where a court, if given free rein, would find that it was to the minor's best interests that one or both of her parents not be informed . . . ." *Id.,* at 1002.

Second, the District Court held that § 12S was defective in permitting a judge to veto the abortion decision of a minor found to be capable of giving informed consent. The court reasoned that upon a finding of maturity and informed consent, the State no longer was entitled to impose legal restrictions upon this decision. *Id.,* at 1003. Given such a finding, the court could see "no reasonable basis" for distinguishing between a minor and an adult, and it therefore concluded that § 12S was not only "an undue burden in the due process sense, [but] a discriminatory denial of equal protection [as well]." *Id.,* at 1004.

Finally, the court decided that § 12S suffered from what it termed "formal overbreadth," *ibid.,* because the statute failed explicitly to inform parents that they must consider only the minor's best interests in deciding whether to grant consent. The court believed that, despite the Supreme Judicial Court's construction of § 12S, parents naturally would infer from the statute that they were entitled to withhold consent for other, impermissible reasons. This was thought to create a "chilling effect" by enhancing the possibility that parental consent would be denied wrongfully and that the minor would have to proceed in court.

Having identified these flaws in § 12S, the District Court considered whether it should engage in "judicial repair." *Id.,* at 1005. It declined either to sever the statute or to give

it a construction different from that set out by the Supreme Judicial Court, as that tribunal arguably had invited it to do. See *Attorney General,* 371 Mass., at 745–746, 360 N. E. 2d, at 292. The District Court therefore adhered to its previous position, declaring § 12S unconstitutional and permanently enjoining its enforcement.[11] Appellants sought review in this Court a second time, and we again noted probable jurisdiction. 439 U. S. 925 (1978).

## II

A child, merely on account of his minority, is not beyond the protection of the Constitution. As the Court said in *In re Gault,* 387 U. S. 1, 13 (1967), "whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone."[12] This observation, of course, is but the beginning of the analysis. The Court long has recognized that the status of minors under the law is unique in many respects. As Mr. Justice Frankfurter aptly put it: "Children have a very special place in life which law should reflect. Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to determination

---

[11] The dissenting judge agreed that the State could not permit a judge to override the decision of a minor found to be mature and capable of giving informed consent to an abortion. He disagreed with the remainder of the court's conclusions: the best-interests limitation on the withholding of parental consent in the Supreme Judicial Court's opinion, he argued, must be treated as if part of the statutory language itself; and he read the evidentiary record as proving that only rarely would a pregnant minor's interests be disserved by consulting with her parents about a desired abortion. He also noted the value to a judge in a § 12S proceeding of having the parents before him as a source of evidence as to the minor's maturity and what course would serve her best interests. See *Baird III,* 450 F. Supp., at 1006–1020.

[12] Similarly, the Court said in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 74 (1976):

"Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights."

of a State's duty towards children." *May* v. *Anderson,* 345 U. S. 528, 536 (1953) (concurring opinion). The unique role in our society of the family, the institution by which "we inculcate and pass down many. of our most cherished values, moral and cultural," *Moore* v. *East Cleveland,* 431 U. S. 494, 503–504 (1977) (plurality opinion), requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children. We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing.

## A

The Court's concern for the vulnerability of children is demonstrated in its decisions dealing with minors' claims to constitutional protection against deprivations of liberty or property interests by the State. With respect to many of these claims, we have concluded that the child's right is virtually coextensive with that of an adult. For example, the Court has held that the Fourteenth Amendment's guarantee against the deprivation of liberty without due process of law is applicable to children in juvenile delinquency proceedings. *In re Gault, supra.* In particular, minors involved in such proceedings are entitled to adequate notice, the assistance of counsel, and the opportunity to confront their accusers. They can be found guilty only upon proof beyond a reasonable doubt, and they may assert the privilege against compulsory self-incrimination. *In re Winship,* 397 U. S. 358 (1970); *In re Gault, supra.* See also *Ingraham* v. *Wright,* 430 U. S. 651, 674 (1977) (corporal punishment of schoolchildren implicates constitutionally protected liberty interest); cf. *Breed* v. *Jones,* 421 U. S. 519 (1975) (Double Jeopardy Clause prohibits prosecuting juvenile as an adult after an adjudicatory finding in juvenile court that he had violated a criminal statute).

Similarly, in *Goss* v. *Lopez,* 419 U. S. 565 (1975), the Court held that children may not be deprived of certain property interests without due process.

These rulings have not been made on the uncritical assumption that the constitutional rights of children are indistinguishable from those of adults. Indeed, our acceptance of juvenile courts distinct from the adult criminal justice system assumes that juvenile offenders constitutionally may be treated differently from adults. In order to preserve this separate avenue for dealing with minors, the Court has said that hearings in juvenile delinquency cases need not necessarily " 'conform with all of the requirements of a criminal trial or even of the usual administrative hearing.' " *In re Gault, supra,* at 30, quoting *Kent* v. *United States,* 383 U. S. 541, 562 (1966). Thus, juveniles are not constitutionally entitled to trial by jury in delinquency adjudications. *McKeiver* v. *Pennsylvania,* 403 U. S. 528 (1971). Viewed together, our cases show that although children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability and their needs for "concern, . . . sympathy, and . . . paternal attention." *Id.,* at 550 (plurality opinion).

## B

Second, the Court has held that the States validly may limit the freedom of children to choose for themselves in the making of important, affirmative choices with potentially serious consequences. These rulings have been grounded in the recognition that, during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them.[13]

---

[13] As MR. JUSTICE STEWART wrote of the exercise by minors of the First Amendment rights that "secur[e] . . . the liberty of each man to

*Ginsberg* v. *New York,* 390 U. S. 629 (1968), illustrates well the Court's concern over the inability of children to make mature choices, as the First Amendment rights involved are clear examples of constitutionally protected freedoms of choice. At issue was a criminal conviction for selling sexually oriented magazines to a minor under the age of 17 in violation of a New York state law. It was conceded that the conviction could not have stood under the First Amendment if based upon a sale of the same material to an adult. *Id.,* at 634. Notwithstanding the importance the Court always has attached to First Amendment rights, it concluded that "even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults . . . ,' " *id.,* at 638, quoting *Prince* v. *Massachusetts,* 321 U. S. 158, 170 (1944).[14] The Court was convinced that the New York Legislature rationally could conclude that the sale to children of the magazines in question presented a danger against which they should be guarded. *Ginsberg, supra,* at 641. It therefore rejected the

decide for himself what he will read and to what he will listen," *Ginsberg* v. *New York,* 390 U. S. 629, 649 (1968) (concurring in result):

"[A]t least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees. It is only upon such a premise, I should suppose, that a State may deprive children of other rights—the right to marry, for example, or the right to vote—deprivations that would be constitutionally intolerable for adults." *Id.,* at 649–650 (footnotes omitted).

[14] In *Prince* an adult had permitted a child in her custody to sell religious literature on a public street in violation of a state child-labor statute. The child had been permitted to engage in this activity upon her own sincere request. 321 U. S., at 162. In upholding the adult's conviction under the statute, we found that "the interests of society to protect the welfare of children" and to give them "opportunities for growth into free and independent well-developed men and citizens," *id.,* at 165, permitted the State to enforce its statute, which "[c]oncededly . . . would be invalid," *id.,* at 167, if made applicable to adults.

argument that the New York law violated the constitutional rights of minors.[15]

## C

Third, the guiding role of parents in the upbringing of their children justifies limitations on the freedoms of minors. The State commonly protects its youth from adverse governmental action and from their own immaturity by requiring parental consent to or involvement in important decisions by minors.[16] But an additional and more important justification for state deference to parental control over children is that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925). "The duty to prepare the child for 'additional obligations' . . .

---

[15] Although the State has considerable latitude in enacting laws affecting minors on the basis of their lesser capacity for mature, affirmative choice, *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503 (1969), illustrates that it may not arbitrarily deprive them of their freedom of action altogether. The Court held in *Tinker* that a schoolchild's First Amendment freedom of expression entitled him, contrary to school policy, to attend school wearing a black armband as a silent protest against American involvement in the hostilities in Vietnam. The Court acknowledged that the State was permitted to prohibit conduct otherwise shielded by the Constitution that "for any reason—whether it stems from time, place, or type of behavior— materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.,* at 513. It upheld the First Amendment right of the schoolchildren in that case, however, not only because it found no evidence in the record that their wearing of black armbands threatened any substantial interference with the proper objectives of the school district, but also because it appeared that the challenged policy was intended primarily to stifle any debate whatsoever—even nondisruptive discussions—on important political and moral issues. See *id.,* at 510.

[16] See, *e. g.,* Mass. Gen. Laws Ann., ch. 207, §§ 7, 24, 25, 33, 33A (West 1958 and Supp. 1979) (parental consent required for marriage of person under 18); Mass. Gen. Laws Ann., ch. 119, § 55A (West Supp. 1979) (waiver of counsel by minor in juvenile delinquency proceedings must be made through parent or guardian).

must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Wisconsin* v. *Yoder,* 406 U. S. 205, 233 (1972). This affirmative process of teaching, guiding, and inspiring by precept and example is essential to the growth of young people into mature, socially responsible citizens.

We have believed in this country that this process, in large part, is beyond the competence of impersonal political institutions. Indeed, affirmative sponsorship of particular ethical, religious, or political beliefs is something we expect the State *not* to attempt in a society constitutionally committed to the ideal of individual liberty and freedom of choice. Thus, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include *preparation for obligations the state can neither supply nor hinder." Prince* v. *Massachusetts, supra,* at 166 (emphasis added).

Unquestionably, there are many competing theories about the most effective way for parents to fulfill their central role in assisting their children on the way to responsible adulthood. While we do not pretend any special wisdom on this subject, we cannot ignore that central to many of these theories, and deeply rooted in our Nation's history and tradition, is the belief that the parental role implies a substantial measure of authority over one's children. Indeed, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg* v. *New York, supra,* at 639.

Properly understood, then, the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter. Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual

participation in a free society meaningful and rewarding.[17] Under the Constitution, the State can "properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg* v. *New York,* 390 U. S., at 639.[18]

### III

With these principles in mind, we consider the specific constitutional questions presented by these appeals. In § 12S, Massachusetts has attempted to reconcile the constitutional right of a woman, in consultation with her physician, to choose to terminate her pregnancy as established by *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973), with the special interest of the State in encouraging an unmarried pregnant minor to seek the advice of her parents in making the important decision whether or not to bear a child. As noted above, § 12S was before us in *Bellotti I,* 428 U. S. 132 (1976), where we remanded the case for interpretation of its provisions by the Supreme Judicial Court of Massachusetts. We previously had held in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976), that a State could not lawfully authorize an absolute parental veto over the decision of a minor to terminate her pregnancy. *Id.,* at 74. In

---

[17] See Hafen, Children's Liberation and the New Egalitarianism: Some Reservations About Abandoning Children to Their "Rights," 1976 B. Y. U. L. Rev. 605.

[18] The Court's opinions discussed in the text above—*Pierce, Yoder, Prince,* and *Ginsberg*—all have contributed to a line of decisions suggesting the existence of a constitutional parental right against undue, adverse interference by the State. See also *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 842–844 (1977); *Carey* v. *Population Services International,* 431 U. S. 678, 708 (1977) (opinion of POWELL, J.); *Moore* v. *East Cleveland,* 431 U. S. 494 (1977) (plurality opinion); *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972); *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923). Cf. *Parham* v. *J. R.,* 442 U. S. 584 (1979); *id.,* at 621 (STEWART, J., concurring in result).

*Bellotti I, supra,* we recognized that § 12S could be read as "fundamentally different from a statute that creates a 'parental veto,' " 428 U. S., at 145, thus "avoid[ing] or substantially modify[ing] the federal constitutional challenge to the statute." *Id.,* at 148. The question before us—in light of what we have said in the prior cases—is whether § 12S, as authoritatively interpreted by the Supreme Judicial Court, provides for parental notice and consent in a manner that does not unduly burden the right to seek an abortion. See *id.,* at 147.

Appellees and intervenors contend that even as interpreted by the Supreme Judicial Court of Massachusetts § 12S does unduly burden this right. They suggest, for example, that the mere requirement of parental notice constitutes such a burden. As stated in Part II above, however, parental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor.[19] It may further determine, as a general proposition, that such consultation is particularly desirable with respect to the abortion decision—one that for some people raises profound moral and religious concerns.[20] As Mr. Justice Stewart wrote in concurrence in *Planned Parenthood of Central Missouri* v. *Danforth, supra,* at 91:

> "There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmar-

---

[19] In *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S., at 75, "[w]e emphasize[d] that our holding . . . [did] not suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy."

[20] The expert testimony at the hearings in the District Court uniformly was to the effect that parental involvement in a minor's abortion decision, if compassionate and supportive, was highly desirable. The findings of the court reflect this consensus. See *Baird I,* 393 F. Supp., at 853.

ried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support. It seems unlikely that she will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place." (Footnote omitted.) [21]

---

[21] MR. JUSTICE STEWART's concurring opinion in *Danforth* underscored the need for parental involvement in minors' abortion decisions by describing the procedures followed at the clinic operated by the Parents Aid Society and Dr. Gerald Zupnick:

"The counseling . . . occurs entirely on the day the abortion is to be performed . . . . It lasts for two hours and takes place in groups that include both minors and adults who are strangers to one another . . . . The physician takes no part in this counseling process . . . . Counseling is typically limited to a description of abortion procedures, possible complications, and birth control techniques . . . .

"The abortion itself takes five to seven minutes . . . . The physician has no prior contact with the minor, and on the days that abortions are being performed at the [clinic], the physician . . . may be performing abortions on many other adults and minors . . . . On busy days patients are scheduled in separate groups, consisting usually of five patients . . . . After the abortion [the physician] spends a brief period with the minor and others in the group in the recovery room . . . ." 428 U. S., at 91–92, n. 2, quoting Brief for Appellants in *Bellotti I*, O. T. 1975, No. 75–73, pp. 43–44.

In *Roe* v. *Wade*, 410 U. S. 113 (1973), and *Doe* v. *Bolton*, 410 U. S. 179 (1973), we emphasized the importance of the role of the attending physician. Those cases involved adult women presumably capable of selecting and obtaining a competent physician. In this case, however, we are concerned only with minors who, according to the record, may range in age from children of 12 years to 17-year-old teenagers. Even the latter are less likely than adults to know or be able to recognize ethical, qualified physicians, or to have the means to engage such professionals. Many minors who bypass their parents probably will resort to an abortion clinic, without being able to distinguish the competent and ethical from those that are incompetent or unethical.

But we are concerned here with a constitutional right to seek an abortion. The abortion decision differs in important ways from other decisions that may be made during minority. The need to preserve the constitutional right and the unique nature of the abortion decision, especially when made by a minor, require a State to act with particular sensitivity when it legislates to foster parental involvement in this matter.

### A

The pregnant minor's options are much different from those facing a minor in other situations, such as deciding whether to marry. A minor not permitted to marry before the age of majority is required simply to postpone her decision. She and her intended spouse may preserve the opportunity for later marriage should they continue to desire it. A pregnant adolescent, however, cannot preserve for long the possibilty of aborting, which effectively expires in a matter of weeks from the onset of pregnancy.

Moreover, the potentially severe detriment facing a pregnant woman, see *Roe* v. *Wade,* 410 U. S., at 153, is not mitigated by her minority. Indeed, considering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor. In addition, the fact of having a child brings with it adult legal responsibility, for parenthood, like attainment of the age of majority, is one of the traditional criteria for the termination of the legal disabilities of minority. In sum, there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible.

Yet, an abortion may not be the best choice for the minor. The circumstances in which this issue arises will vary widely. In a given case, alternatives to abortion, such as marriage to the father of the child, arranging for its adoption, or assuming the responsibilities of motherhood with the assured support of

family, may be feasible and relevant to the minor's best interests. Nonetheless, the abortion decision is one that simply cannot be postponed, or it will be made by default with far-reaching consequences.

For these reasons, as we held in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S., at 74, "the State may not impose a blanket provision . . . requiring the consent of a parent or person *in loco parentis* as a condition for abortion of an unmarried minor during the first 12 weeks of her pregnancy." Although, as stated in Part II, *supra,* such deference to parents may be permissible with respect to other choices facing a minor, the unique nature and consequences of the abortion decision make it inappropriate "to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." 428 U. S., at 74. We therefore conclude that if the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure [22] whereby authorization for the abortion can be obtained.

A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; [23] or

---

[22] As § 12S provides for involvement of the state superior court in minors' abortion decisions, we discuss the alternative procedure described in the text in terms of judicial proceedings. We do not suggest, however, that a State choosing to require parental consent could not delegate the alternative procedure to a juvenile court or an administrative agency or officer. Indeed, much can be said for employing procedures and a forum less formal than those associated with a court of general jurisdiction.

[23] The nature of both the State's interest in fostering parental authority and the problem of determining "maturity" makes clear why the State generally may resort to objective, though inevitably arbitrary, criteria such as age limits, marital status, or membership in the Armed Forces for lifting some or all of the legal disabilities of minority. Not only is it difficult to

(2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained. In sum, the procedure must ensure that the provision requiring parental consent does not in fact amount to the "absolute; and possibly arbitrary, veto" that was found impermissible in *Danforth. Ibid.*

## B

It is against these requirements that § 12S must be tested. We observe initially that as authoritatively construed by the highest court of the State, the statute satisfies some of the concerns that require special treatment of a minor's abortion decision. It provides that if parental consent is refused, authorization may be "obtained by order of a judge of the superior court for good cause shown, after such hearing as he deems necessary." A superior court judge presiding over a § 12S proceeding "must disregard all parental objections, and other considerations, which are not based exclusively on what would serve the minor's best interests." [24] *Attorney General,*

---

define, let alone determine, maturity, but also the fact that a minor may be very much an adult in some respects does not mean that his or her need and opportunity for growth under parental guidance and discipline have ended. As discussed in the text, however, the peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors.

[24] The Supreme Judicial Court held that § 12S imposed this standard on the superior court in large part because it construed the statute as containing the same restriction on parents. See *supra,* at 630. The court concluded that the judge should not be entitled "to exercise his authority on a standard broader than that to which a parent must adhere." *Attorney General,* 371 Mass., at 748, 360 N. E. 2d, at 293.

Intervenors argue that, assuming state-supported parental involvement in the minor's abortion decision is permissible, the State may not endorse the

371 Mass., at 748, 360 N. E. 2d, at 293. The Supreme Judicial Court also stated: "Prompt resolution of a [§ 12S] proceeding may be expected. . . . The proceeding need not be brought in the minor's name and steps may be taken, by impoundment or otherwise, to preserve confidentiality as to the minor and her parents. . . . [W]e believe that an early hearing and decision on appeal from a judgment of a Superior Court judge may also be achieved." *Id.*, at 757–758, 360 N. E. 2d, at 298. The court added that if these expectations were not met, either the superior court, in the exercise of its rulemaking power, or the Supreme Judicial Court would be willing to eliminate any undue burdens by rule or order. *Ibid.*[25]

Despite these safeguards, which avoid much of what was objectionable in the statute successfully challenged in *Danforth*, § 12S falls short of constitutional standards in certain respects. We now consider these.

---

withholding of parental consent for any reason not believed to be in the minor's best interests. They agree with the District Court that, even though § 12S was construed by the highest state court to impose this restriction, the statute is flawed because the restriction is not apparent on its face. Intervenors thus concur in the District Court's assumption that the statute will encourage parents to withhold consent for impermissible reasons. See *Baird III*, 450 F. Supp., at 1004–1005; *Baird II*, 428 F. Supp. 854, 855–856 (Mass. 1977).

There is no basis for this assertion. As a general rule, the interpretation of a state statute by the State's highest court "is as though written into the ordinance itself," *Poulos* v. *New Hampshire*, 345 U. S. 395, 402 (1953), and we are obliged to view the restriction on the parental-consent requirement "as if [§ 12S] had been so amended by the [Massachusetts] legislature." *Winters* v. *New York*, 333 U. S. 507, 514 (1948).

[25] Intervenors take issue with the Supreme Judicial Court's assurances that judicial proceedings will provide the necessary confidentiality, lack of procedural burden, and speed of resolution. In the absence of any evidence as to the operation of judicial proceedings under § 12S—and there is none, since appellees successfully sought to enjoin Massachusetts from putting it into effect—we must assume that the Supreme Judicial Court's judgment is correct.

## (1)

Among the questions certified to the Supreme Judicial Court was whether § 12S permits any minors—mature or immature—to obtain judicial consent to an abortion without any parental consultation whatsoever. See n. 9, *supra*. The state court answered that, in general, it does not. "[T]he consent required by [§ 12S must] be obtained for every non-emergency abortion where the mother is less than eighteen years of age and unmarried." *Attorney General, supra*, at 750, 360 N. E. 2d, at 294. The text of § 12S itself states an exception to this rule, making consent unnecessary from any parent who has "died or has deserted his or her family."[26] The Supreme Judicial Court construed the statute as containing an additional exception: Consent need not be obtained "where no parent (or statutory substitute) is available." 371 Mass., at 750, 360 N. E. 2d, at 294. The court also ruled that an available parent must be given notice of any judicial proceedings brought by a minor to obtain consent for an abortion.[27] *Id.,* at 755–756, 360 N. E. 2d, at 297.

---

[26] The statute also provides that "[i]f both parents have died or have deserted their family, consent of the mother's guardian or other person having duties similar to a guardian, or any person who had assumed the care and custody of the mother is sufficient."

[27] This reading of the statute requires parental consultation and consent more strictly than appellants themselves previously believed was necessary. In their first argument before this Court, and again before the Supreme Judicial Court, appellants argued that § 12S was not intended to abrogate Massachusetts' common-law "mature minor" rule as it applies to abortions. See 428 U. S., at 144. They also suggested that, under some circumstances, § 12S might permit even immature minors to obtain judicial approval for an abortion without any parental consultation. See 428 U. S., at 145; *Attorney General, supra*, at 751, 360 N. E. 2d, at 294. The Supreme Judicial Court sketched the outlines of the mature minor rule that would apply in the absence of § 12S: "The mature minor rule calls for an analysis of the nature of the operation, its likely benefit, and the capacity of the particular minor to understand fully what the medical procedure involves. . . . Judicial intervention is not required. If

We think that, construed in this manner, § 12S would impose an undue burden upon the exercise by minors of the right to seek an abortion. As the District Court recognized, "there are parents who would obstruct, and perhaps altogether prevent, the minor's right to go to court." *Baird III,* 450 F. Supp., at 1001. There is no reason to believe that this would be so in the majority of cases where consent is withheld. But many parents hold strong views on the subject of abortion, and young pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct both an abortion and their access to court. It would be unrealistic, therefore, to assume that the mere existence of a legal right to seek relief in superior court provides an effective avenue of relief for some of those who need it the most.

We conclude, therefore, that under state regulation such as that undertaken by Massachusetts, every minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents. If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent. If she fails to satisfy the court that she is competent to make this decision independently, she must be permitted to show that an abortion nevertheless would be in her

judicial approval is obtained, however, the doctor is protected from a subsequent claim that the circumstances did not warrant his reliance on the mature minor rule, and, of course, the minor patient is afforded advance protection against a misapplication of the rule." *Id.,* at 752, 360 N. E. 2d, at 295. "We conclude that, apart from statutory limitations which are constitutional, where the best interests of a minor will be served by not notifying his or her parents of intended medical treatment and where the minor is capable of giving informed consent to that treatment, the mature minor rule applies in this Commonwealth." *Id.,* at 754, 360 N. E. 2d, at 296. The Supreme Judicial Court held that the common-law mature minor rule was inapplicable to abortions because it had been legislatively superseded by § 12S.

best interests. If the court is persuaded that it is, the court must authorize the abortion. If, however, the court is not persuaded by the minor that she is mature or that the abortion would be in her best interests, it may decline to sanction the operation.

There is, however, an important state interest in encouraging a family rather than a judicial resolution of a minor's abortion decision. Also, as we have observed above, parents naturally take an interest in the welfare of their children— an interest that is particularly strong where a normal family relationship exists and where the child is living with one or both parents. These factors properly may be taken into account by a court called upon to determine whether an abortion in fact is in a minor's best interests. If, all things considered, the court determines that an abortion is in the minor's best interests, she is entitled to court authorization without any parental involvement. On the other hand, the court may deny the abortion request of an immature minor in the absence of parental consultation if it concludes that her best interests would be served thereby, or the court may in such a case defer decision until there is parental consultation in which the court may participate. But this is the full extent to which parental involvement may be required.[28] For the reasons stated above, the constitutional right to seek an abortion may not be unduly burdened by state-imposed conditions upon initial access to court.

### (2)

Section 12S requires that both parents consent to a minor's abortion. The District Court found it to be "custom" to perform other medical and surgical procedures on minors with the consent of only one parent, and it concluded that "nothing about abortions . . . requires the minor's interest to be treated

---

[28] Of course, if the minor consults with her parents voluntarily and they withhold consent, she is free to seek judicial authorization for the abortion immediately.

differently." *Baird I*, 393 F. Supp., at 852. See *Baird III*, *supra*, at 1004 n. 9.

We are not persuaded that, as a general rule, the requirement of obtaining both parents' consent unconstitutionally burdens a minor's right to seek an abortion. The abortion decision has implications far broader than those associated with most other kinds of medical treatment. At least when the parents are together and the pregnant minor is living at home, both the father and mother have an interest—one normally supportive—in helping to determine the course that is in the best interests of a daughter. Consent and involvement by parents in important decisions by minors long have been recognized as protective of their immaturity. In the case of the abortion decision, for reasons we have stated, the focus of the parents' inquiry should be the best interests of their daughter. As every pregnant minor is entitled in the first instance to go directly to the court for a judicial determination without prior parental notice, consultation, or consent, the general rule with respect to parental consent does not unduly burden the constitutional right. Moreover, where the pregnant minor goes to her parents and consent is denied, she still must have recourse to a prompt judicial determination of her maturity or best interests.[29]

## (3)

Another of the questions certified by the District Court to the Supreme Judicial Court was the following: "If the superior court finds that the minor is capable [of making], and has, in fact, made and adhered to, an informed and reasonable decision to have an abortion, may the court refuse its consent based on a finding that a parent's, or its own, contrary deci-

---

[29] There will be cases where the pregnant minor has received approval of the abortion decision by one parent. In that event, the parent can support the daughter's request for a prompt judicial determination, and the parent's support should be given great, if not dispositive, weight.

sion is a better one?" *Attorney General,* 371 Mass., at 747 n. 5, 360 N. E. 2d, at 293 n. 5. To this the state court answered:

> "[W]e do not view the judge's role as limited to a determination that the minor is capable of making, and has made, an informed and reasonable decision to have an abortion. Certainly the judge must make a determination of those circumstances, but, if the statutory role of the judge to determine the best interests of the minor is to be carried out, he must make a finding on the basis of all relevant views presented to him. We suspect that the judge will give great weight to the minor's determination, if informed and reasonable, but in circumstances where he determines that the best interests of the minor will not be served by an abortion, the judge's determination should prevail, assuming that his conclusion is supported by the evidence and adequate findings of fact." *Id.,* at 748, 360 N. E. 2d, at 293.

The Supreme Judicial Court's statement reflects the general rule that a State may require a minor to wait until the age of majority before being permitted to exercise legal rights independently. See n. 23, *supra.* But we are concerned here with the exercise of a constitutional right of unique character. See *supra,* at 642–643. As stated above, if the minor satisfies a court that she has attained sufficient maturity to make a fully informed decision, she then is entitled to make her abortion decision independently. We therefore agree with the District Court that § 12S cannot constitutionally permit judicial disregard of the abortion decision of a minor who has been determined to be mature and fully competent to assess the implications of the choice she has made.[30]

---

[30] Appellees and intervenors have argued that § 12S violates the Equal Protection Clause of the Fourteenth Amendment. As we have concluded that the statute is constitutionally infirm for other reasons, there is no need to consider this question.

## IV

Although it satisfies constitutional standards in large part, § 12S falls short of them in two respects: First, it permits judicial authorization for an abortion to be withheld from a minor who is found by the superior court to be mature and fully competent to make this decision independently. Second, it requires parental consultation or notification in every instance, without affording the pregnant minor an opportunity to receive an independent judicial determination that she is mature enough to consent or that an abortion would be in her best interests.[31] Accordingly, we affirm the judgment of the District Court insofar as it invalidates this statute and enjoins its enforcement.[32]

*Affirmed.*

MR. JUSTICE REHNQUIST, concurring.

I join the opinion of MR. JUSTICE POWELL and the judgment of the Court. At such time as this Court is willing to

---

[31] Section 12S evidently applies to all nonemergency abortions performed on minors, without regard to the period in pregnancy during which the procedure occurs. As the court below recognized, most abortions are performed during the early stages of pregnancy, before the end of the first trimester. See *Baird III,* 450 F. Supp., at 1001; *Baird I,* 393 F. Supp., at 853. This coincides approximately with the pre-viability period during which a pregnant woman's right to decide, in consultation with her physician, to have an abortion is most immune to state intervention. See *Roe* v. *Wade,* 410 U. S., at 164–165.

The propriety of parental involvement in a minor's abortion decision does not diminish as the pregnancy progresses and legitimate concerns for the pregnant minor's health increase. Furthermore, the opportunity for direct access to court which we have described is adequate to safeguard throughout pregnancy the constitutionally protected interests of a minor in the abortion decision. Thus, although a significant number of abortions within the scope of § 12S might be performed during the later stages of pregnancy, we do not believe a different analysis of the statute is required for them.

[32] The opinion of MR. JUSTICE STEVENS, concurring in the judgment, joined by three Members of the Court, characterizes this opinion as "ad-

reconsider its earlier decision in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976), in which I joined the opinion of Mr. Justice White, dissenting in part, I shall be more than willing to participate in that task. But unless and until that time comes, literally thousands of judges cannot be left with nothing more than the guidance offered by a truly fragmented holding of this Court.

Mr. Justice Stevens, with whom Mr. Justice Brennan, Mr. Justice Marshall, and Mr. Justice Blackmun join, concurring in the judgment.

In *Roe* v. *Wade,* 410 U. S. 113, the Court held that a woman's right to decide whether to terminate a pregnancy is

visory" and the questions it addresses as "hypothetical." Apparently, this is criticism of our attempt to provide some guidance as to how a State constitutionally may provide for adult involvement—either by parents or a state official such as a judge—in the abortion decisions of minors. In view of the importance of the issue raised, and the protracted litigation to which these parties already have been subjected, we think it would be irresponsible simply to invalidate § 12S without stating our views as to the controlling principles.

The statute before us today is the same one that was here in *Bellotti I.* The issues it presents were not then deemed "hypothetical." In a unanimous opinion, we remanded the case with directions that appropriate questions be certified to the Supreme Judicial Court of Massachusetts "concerning the meaning of [§ 12S] and the procedure it imposes." 428 U. S., at 151. We directed that this be done because, as stated in the opinion, we thought the construction of § 12S urged by appellants would "avoid or substantially modify the federal constitutional challenge to the statute." *Id.,* at 148. The central feature of § 12S was its provision that a state-court judge could make the ultimate decision, when necessary, as to the exercise by a minor of the right to an abortion. See *id.,* at 145. We held that this "would be fundamentally different from a statute that creates a 'parental veto' [of the kind rejected in *Danforth.*]" *Ibid.* (footnote omitted). Thus, all Members of the Court agreed that providing for decisionmaking authority in a judge was not the kind of veto power held invalid in *Danforth.* The basic issues that were before us in *Bellotti I* remain in the case, sharpened by the construction of § 12S by the Supreme Judicial Court.

entitled to constitutional protection. In *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 72–75, the Court held that a pregnant minor's right to make the abortion decision may not be conditioned on the consent of one parent. I am persuaded that these decisions require affirmance of the District Court's holding that the Massachusetts statute is unconstitutional.

The Massachusetts statute is, on its face, simple and straightforward. It provides that every woman under 18 who has not married must secure the consent of both her parents before receiving an abortion. "If one or both of the mother's parents refuse such consent, consent may be obtained by order of a judge of the superior court for good cause shown." Mass. Gen. Laws Ann., ch. 112, § 12S (West Supp. 1979).

Whatever confusion or uncertainty might have existed as to how this statute was to operate, see *Bellotti* v. *Baird,* 428 U. S. 132, has been eliminated by the authoritative construction of its provisions by the Massachusetts Supreme Judicial Court. See *Baird* v. *Attorney General,* 371 Mass. 741, 360 N. E. 2d 288 (1977). The statute was construed to require that every minor who wishes an abortion must first seek the consent of both parents, unless a parent is not available or unless the need for the abortion constitutes " 'an emergency requiring immediate action.' " *Id.,* at 750, 360 N. E. 2d, at 294. Both parents, so long as they are available, must also receive notice of judicial proceedings brought under the statute by the minor. In those proceedings, the task of the judge is to determine whether the best interests of the minor will be served by an abortion. The decision is his to make, even if he finds "that the minor is capable of making, and has made, an informed and reasonable decision to have an abortion." *Id.,* at 748, 360 N. E. 2d, at 293. Thus, no minor in Massachusetts, no matter how mature and capable of informed decisionmaking, may receive an abortion without the consent

of either both her parents or a superior court judge. In every instance, the minor's decision to secure an abortion is subject to an absolute third-party veto.[1]

In *Planned Parenthood of Central Missouri* v. *Danforth, supra,* this Court invalidated statutory provisions requiring the consent of the husband of a married woman and of one parent of a pregnant minor to an abortion. As to the spousal consent, the Court concluded that "we cannot hold that the State has the constitutional authority to give the spouse unilaterally the ability to prohibit the wife from terminating her pregnancy, when the State itself lacks that right." 428 U. S., at 70. And as to the parental consent, the Court held that "[j]ust as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." *Id.,* at 74. These holdings, I think, equally apply to the Massachusetts statute. The differences between the two statutes are few. Unlike the Missouri statute, Massachusetts requires the consent of both of the woman's parents. It does, of course, provide an alternative in the form of a suit initiated by the woman in superior court. But in that proceeding, the judge is afforded an absolute veto over the minor's decisions, based on his judgment of her best interests. In Massachusetts, then, as in Missouri, the State has imposed an "absolute limitation on the minor's right to obtain an abortion," *id.,* at 90 (STEWART, J., concurring), applicable to every pregnant minor in the State who has not married.

---

[1] By affording such a veto, the Massachusetts statute does far more than simply provide for notice to the parents. See *post,* at 657 (WHITE, J., dissenting). Neither *Danforth* nor this case determines the constitutionality of a statute which does no more than require notice to the parents, without affording them or any other third party an absolute veto.

The provision of an absolute veto to a judge—or, potentially, to an appointed administrator [2]—is to me particularly troubling. The constitutional right to make the abortion decision affords protection to both of the privacy interests recognized in this Court's cases: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen* v. *Roe,* 429 U. S. 589, 599–600 (footnotes omitted). It is inherent in the right to make the abortion decision that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties. In Massachusetts, however, every minor who cannot secure the consent of both her parents—which under *Danforth* cannot be an absolute prerequisite to an abortion—is required to secure the consent of the sovereign. As a practical matter, I would suppose that the need to commence judicial proceedings in order to obtain a legal abortion would impose a burden at least as great as, and probably greater than, that imposed on the minor child by the need to obtain the consent of a parent.[3] Moreover, once this burden is met, the only standard provided for the judge's decision is the best interest of the minor. That standard provides little real guidance to the judge, and his decision must necessarily reflect personal and societal values and mores whose enforcement upon the minor—particularly when contrary to her own informed and reasonable decision—is fundamentally at odds

---

[2] See *ante,* at 643 n. 22.

[3] A minor may secure the assistance of counsel in filing and prosecuting her suit, but that is not guaranteed. The Massachusetts Supreme Judicial Court in response to the question whether a minor, upon a showing of indigency, may have court-appointed counsel, "construe[d] the statutes of the Commonwealth to authorize the appointment of counsel or a guardian ad litem for an indigent minor at public expense, if necessary, if the judge, *in his discretion,* concludes that the best interests of the minor would be served by such an appointment." *Baird* v. *Attorney General,* 371 Mass. 741, 764, 360 N. E. 2d 288, 301 (1977) (emphasis added).

with privacy interests underlying the constitutional protection afforded to her decision.

In short, it seems to me that this litigation is governed by *Danforth;* to the extent this statute differs from that in *Danforth,* it is potentially even more restrictive of the constitutional right to decide whether or not to terminate a pregnancy. Because the statute has been once authoritatively construed by the Massachusetts Supreme Judicial Court, and because it is clear that the statute as written and construed is not constitutional, I agree with MR. JUSTICE POWELL that the District Court's judgment should be affirmed. Because his opinion goes further, however, and addresses the constitutionality of an abortion statute that Massachusetts has not enacted, I decline to join his opinion.[4]

MR. JUSTICE WHITE, dissenting.

I was in dissent in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 94–95 (1976), on the issue of the validity of requiring the consent of a parent when an unmarried woman under 18 years of age seeks an abortion. I continue to have the views I expressed there and also agree with much of what MR. JUSTICE STEVENS said in dissent in that

---

[4] Until and unless Massachusetts or another State enacts a less restrictive statutory scheme, this Court has no occasion to render an advisory opinion on the constitutionality of such a scheme. A real statute—rather than a mere outline of a possible statute—and a real case or controversy may well present questions that appear quite different from the hypothetical questions MR. JUSTICE POWELL has elected to address. Indeed, there is a certain irony in his suggestion that a statute that is intended to vindicate "the special interest of the State in encouraging an unmarried pregnant minor to seek the advice of her parents in making the important decision whether or not to bear a child," see *ante,* at 639, need not require notice to the parents of the minor's intended decision. That irony makes me wonder whether any legislature concerned with parental consultation would, in the absence of today's advisory opinion, have enacted a statute comparable to the one my Brethren have discussed.

case. *Id.,* at 101–105. I would not, therefore, strike down this Massachusetts law.

But even if a parental consent requirement of the kind involved in *Danforth* must be deemed invalid, that does not condemn the Massachusetts law, which, when the parents object, authorizes a judge to permit an abortion if he concludes that an abortion is in the best interests of the child. Going beyond *Danforth,* the Court now holds it unconstitutional for a State to require that in all cases parents receive notice that their daughter seeks an abortion and, if they object to the abortion, an opportunity to participate in a hearing that will determine whether it is in the "best interests" of the child to undergo the surgery. Until now, I would have thought inconceivable a holding that the United States Constitution forbids even notice to parents when their minor child who seeks surgery objects to such notice and is able to convince a judge that the parents should be denied participation in the decision.

With all due respect, I dissent.