Helen R. ARNOLD, individually, and as Mother and next friend of John Doe, a minor unemancipated child, and, further as putative grandmother and next friend of that certain unborn child conceived by the said John Doe with one Jane Doe, as is more fully described herein, and Charles Davis, individually, and as Father and next friend of Jane Doe, a minor unemancipated child, Plaintiffs,

v.

BOARD OF EDUCATION OF ESCAMBIA COUNTY, ALABAMA, Kay Rose, individually and in her official capacity as guidance counsellor for the said Board of Education of Escambia County, Alabama, Melvin Powell, individually and in his official capacity as an employee of the Board of Education of Escambia County, Alabama, Defendants.

Civ. A. No. 86–0928–B.

United States District Court, S.D. Alabama, S.D.

Nov. 1, 1990.

George Huddleston, Daphne, Ala., for plaintiffs.

Susan Williams Reeves, Birmingham, Ala., Broox G. Garrett, Jr., Brewton, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUTLER, District Judge.

### INTRODUCTION

This cause is before the Court on defendants' motion for summary judgment, filed March 1, 1990, to which response was due April 1, 1990. On April 23, this Court issued an order cautioning plaintiffs that they must respond to the motion on or before May 18, and that failure to respond could result in the granting of defendants' motion. Service of the April 23 order was obtained on all plaintiffs. No response has been filed. Pursuant to this Court's local

rule, failure to respond to a motion for summary judgment is "considered an admission that no material factual dispute exists." Accordingly, there being no genuine issues of material fact, and upon careful review and consideration, the Court concludes that the defendants are entitled to judgment as a matter of law and that defendants' motion for summary judgment is due to be granted.

### FINDINGS OF FACT [1]

1. Jane Doe, born July 14, 1970, is the natural mother of Terrel Doe, born July 31, 1985.

2. On April 10, 1986, Jane Doe signed consent forms for an abortion for herself which was performed on April 10, 1986, at the Ladies Center of Mobile in Mobile, Alabama.

3. Jane Doe has never been married.

4. Jane Doe was over the age of fourteen (14) when she consented to an abortion on April 10, 1986 in Mobile, Alabama.

5. On April 10, 1986, Jane Doe agreed in writing that she read and understood the "Disclosure of Risks, Benefits, and Alternatives" involved in an abortion she obtained at the Ladies Center of Mobile.

6. Betty Davis Grant of Atmore, Alabama, has custody, care and control of Jane Doe by order of the courts of the State of Alabama.

7. Terrel Doe, infant son of Jane Doe, does not live with and is not financially supported by Jane Doe.

8. The abortion performed on Jane Doe in April 1986 was performed during the first trimester of her pregnancy.

9. Jane Doe solicited and obtained the services of her brother-in-law, Willie Hubert, to drive her to and from the Ladies Center on April 10, 1986 in his automobile for the purpose of obtaining an abortion for herself.

10. Jane Doe asked her brother-in-law, Willie Hubert, to drive her to Brewton

---

1. Paragraphs 1 through 22 of the Findings of Fact constitute facts which have been admitted by the plaintiffs as true. See Exhibits 1a and 1b to defendants' motion for summary judgment (Defendants' Request to Admit and the Plaintiffs' Answers).

from Atmore, Alabama, to apply for a medicaid card.

11. Willie Hubert drove Jane Doe to Brewton to apply for a medicaid card.

12. The pregnancy aborted by Jane Doe had been diagnosed by Dr. Tucker of Physicians Associates in Atmore.

13. John Doe was born on May 15, 1969, in Atmore, Alabama.

14. John Doe has never provided financially for Terrel Doe, the minor child of John and Jane Doe.

15. Defendant Kay Rose talked to plaintiff Jane Doe and plaintiff John Doe about getting married in 1986 as an alternative to abortion but John Doe refused, saying he was not ready to get married.

16. In April 1986, John Doe told Jane Doe that the decision to have an abortion was up to her.

17. John Doe accompanied Jane Doe for the purposes of having an abortion performed on Jane Doe at the Ladies Center of Mobile, Alabama.

18. The act upon which John Doe bases his complaint that defendant Powell threatened or coerced Jane Doe into an abortion was defendant Powell's loan to John Doe of less than $25.00.

19. Plaintiff Jane Doe has had no contact with any member of the defendant Escambia County Board of Education or the Superintendent regarding any matter which is the subject of the complaint.

20. No defendant traveled with or in any way accompanied plaintiff Jane Doe to Mobile, Alabama, on the date of her abortion.

21. Jane Doe is the child of Betty Jean Davis and Charles Davis, who divorced in September 1982. The decree of divorce awarded custody of Jane Doe to her mother.

22. Jane Doe lived in Atmore, Alabama all of her childhood and she had lived with her mother and other relatives in Alabama until September 1986, when she went to St. Petersburg, Florida, to live for the first time with her father, plaintiff Charles Davis.

23. Jane Doe did not like living with her father in 1986 and stayed only 3 months.

24. Jane Doe's mother is a cook at Chicken Express and her step-father works at an aluminum plant in Bay Minette, Alabama. He is also the head preacher at a Holiness Church.

25. Jane Doe left her mother and step-father's home in December 1985 and stayed for a while with one grandmother, then another grandmother, then an aunt, and then another aunt.

26. In January, February, and March 1986, when Jane Doe believed, and later confirmed, that she was pregnant, she was not living with her mother and did not have a home.

27. She did not tell one of her aunts, Ms. Crook, with whom she stayed a while that she thought she was pregnant because:

> You know, like I already had one child, right. It was like really pitiful for me to have a child and turn back around and have another one.

Jane Doe was also afraid that if she told her aunt she was pregnant, she would make Jane leave the house.

28. Jane Doe told her father, plaintiff Charles Davis, that she did not tell her mother or father of the 1986 pregnancy because "she knew her mother would be mad with her and figured [her father] would be mad."

29. Jane Doe did not tell her mother she was pregnant and she explains why she did not:

> Because I had a hard time beside my mamma already mad with me. She would not let me come see my baby or come home. How I going to tell my mamma I'm pregnant.

30. Jane Doe claims her step-father also threw her out of her mother's house and had beaten her.

31. Jane Doe told defendant Rose that her step-father beat her and her sister and that she left home because she hated to hear the screaming.

32. After leaving her mother's home at age 15, Jane Doe had no plans to return.

33. Since December, 1985, Jane Doe's child Terrel has been in the custody of Jane's mother and her mother tells Jane when she can see the child.

34. Jane Doe's child Terrel remains with Jane's mother because Jane does not have the ability to care for her child.

35. Jane Doe told defendant Kay Rose, a school counselor, about the beatings and abuse at home as a reason for leaving home.

36. Jane Doe first counselled with defendant Rose on March 27, 1986. Jane was referred to Rose for counselling by Jane's P.E. coach whom Jane told she had problems at home to deal with. The coach guessed she was pregnant.

37. During the first counselling session, Jane Doe told defendant Rose that she (Jane Doe) had had a baby at age 14 by cesarean section, that she had left home because she was being abused by her stepfather and that she believed she was pregnant again.

38. Defendant Rose reported the abuse charge to the government authorities.

39. When Kay Rose heard Jane Doe say she was possibly pregnant by John Doe, Rose called John Doe to her office to discuss the matter.

40. On March 27, 1986, defendant Rose, Jane Doe and John Doe went to Physicians Associates where Dr. Larry Tucker confirmed that Jane Doe was pregnant. Dr. Tucker asked Jane Doe what she wanted to do and Jane responded that she wanted an abortion.

41. At the clinic, Dr. Tucker gave John Doe and Jane Doe pamphlets telling about abortion and the surrounding clinics where abortions were performed.

42. Dr. Tucker told Jane Doe and John Doe there was a time limit and cut-off period in which to have an abortion. John Doe and Jane Doe were told that an abortion would have to be performed within the next two weeks or Jane Doe could not have an abortion.

43. Both Jane Doe and John Doe told Kay Rose that they did not want their mothers to know of the pregnancy because they were not supposed to be seeing each other.

44. After Thursday, March 27, 1986, Kay Rose next saw Jane Doe on Monday, March 31, 1986.

45. John Doe told Kay Rose he was going to call his father in New York to get the money for Jane Doe to have an abortion.

46. On April 4, 1986, at a meeting set up by Kay Rose, options and choices to abortion were presented to Jane Doe and John Doe who rejected all choices but abortion.

47. Defendant Rose did not notify the parents or family of students who came to her for pregnancy counselling unless the students requested her to do so.

48. Kay Rose made efforts to get Jane Doe and John Doe themselves to discuss Jane Doe's pregnancy with their mothers.

49. Kay Rose repeatedly suggested that Jane Doe call her mother and talk to her. Jane Doe attempted to call her mother once at the suggestion of defendant Rose from defendant Rose's office. Before the abortion in April 1986, Jane Doe's mother began screaming when Kay Rose did attempt to call the mother about her daughter.

50. Jane Doe was driven to Mobile by her brother-in-law, Willie Hubert, for the purpose of having an abortion. She was also accompanied by John Doe and Willie Hubert's daughter.

51. After the birth of Terrel, Jane Doe's mother did not want her to see or associate with John.

52. John Doe's mother, plaintiff Arnold, did not want John to associate with Jane Doe.

53. Vicki Harrelson was Jane Doe's juvenile probation officer.

54. Kay Rose reported the abuse and neglect of Jane Doe to the Department of Human Resources and asked Kathy Hill of that state agency to confer with Jane Doe on April 4, 1986. Ms. Hill, Kay Rose and

Vicki Harrelson all met with Jane Doe on April 4, 1986.

55. On April 4, 1986, Kathy Hill offered options to Jane Doe such as foster care or a maternity home, but told Jane Doe that state agency employees were not allowed to discuss abortion as an option.

56. In the presence of Kay Rose and Vicki Harrelson, Jane Doe insisted to Kathy Hill that she wanted an abortion and Kathy Hill encouraged her to talk to her family about her pregnancy.

57. Jane Doe told Kathy Hill she did not want to discuss the matter with her mother because her mother might not let her have an abortion.

58. Ms. Hill assisted Jane Doe in trying to get some financial assistance and medicaid.

59. Kathy Hill discussed all pregnancy options but abortion with Jane Doe, and Jane Doe told Kathy Hill "her parents would not let her give the child up for adoption and that she had a cesarean section with her first child and she did not want to go through that again." Jane Doe told Kathy Hill that she and her boyfriend had made up their minds to have an abortion.

60. Jane Doe also sought the opinion on the advisability of an abortion of her homeroom and English teacher, Wilma Smith. Wilma Smith advised Jane Doe, that she personally did not believe in abortion, however, she told Jane Doe that she must make her own decision.

61. Wilma Smith felt as if Kay Rose's counselling "had worked a miracle with Jane" in helping her over her depression.

62. Jane Doe wrote a letter to Wilma Smith in which Jane Doe told Wilma Smith "me and John Doe want an abortion because we cannot take care of another baby."

63. Jane Doe has admitted that she was not forced by anyone to have an abortion.

64. Jane Doe claims Kay Rose pressured her about abortion by asking "how are you going to take care of the baby, where are you going to take the baby, who going to take care of it." She claims that Kay Rose "kept going on about how you going to take care of the baby."

65. Jane Doe has admitted that defendant Rose's question regarding how she was going to take care of the baby was basically a good question.

66. Before Jane Doe had an abortion in April 1986, Kay Rose talked to both Jane Doe and John Doe about the alternative of their getting married, but "He [John Doe] said he wasn't ready to get married, just like I wasn't." John Doe wanted to play football and go into the Army.

67. In April 1986, Jane Doe believed John Doe did not have an opinion about whether Jane Doe should have an abortion and he did not affect the abortion decision. As Jane Doe states, "I make decisions on my own."

68. Prior to Jane Doe's 1986 abortion, defendant Rose also asked the same questions of John Doe regarding who would care for the baby as she had asked Jane Doe since both students came to Rose's office at the same time.

69. In December 1986, Jane Doe stated under oath that she had not wanted a second baby and "can wait for that" because "I don't need no baby now."

70. Jane Doe has had no contact with defendant Powell and never talked to him.

71. Jane Doe has had no contact with any member of the Escambia County Board of Education about her pregnancy or abortion nor does she know who is on that board.

72. Jane Doe does not think her race or color has anything to do with the issue of her having an abortion or with Kay Rose's alleged suggestion that she have an abortion. Jane Doe's father, plaintiff Charles Davis does not believe race has anything to do with the lawsuit.

73. Jane Doe told one aunt that she lived with in 1986 prior to the abortion that she was pregnant. Jane Doe thinks her father knew of her pregnancy because her paternal grandmother, called "Big Momma," also knew she was pregnant prior to her 1986 abortion and both the aunt and

grandmother told Jane Doe they were going to write Charles Davis, her father.

74. John Doe did not talk to his mother about Jane Doe's abortion because he "just felt, you know, like—I didn't know we was going to it, you know, have the abortion. What was I—not really nothing to tell."

75. John Doe was scared to tell his mother that Jane Doe might be pregnant because he was scared of her "for getting—making another mistake by getting a baby."

76. John Doe did not tell his father Jane Doe was pregnant because he did not know his father's address or phone number.

77. Defendant Powell did not attempt to prevent either John Doe or Jane Doe from telling any parent about Jane Doe's 1986 pregnancy and defendant Powell offered to tell Jane Doe's mother himself.

78. Defendant Powell's sole contact with John Doe was to loan John Doe $20.00 which John Doe claims he used for gas money when he accompanied Jane Doe to have an abortion.

79. Defendant Powell did not threaten or coerce John Doe into participating with Jane Doe to abort her 1986 pregnancy.

80. In this action, John Doe has the same complaint about defendant Rose that he has against defendant Powell: loaning him money and failing to notify his parents.

81. John Doe has had no contact with the Escambia County Board of Education or any member of that board and does not know who those members are.

82. John Doe has no claims in this action based on the fact that he is black.

83. Defendant Rose suggested to Jane Doe and John Doe together that they have the baby and get married as an alternative to an abortion, but John Doe vetoed that suggestion and responded that he wanted to get a football scholarship.

84. When John Doe was suspended by defendant Powell for three days, he had been sent to defendant Powell's office by a teacher who had given John Doe 100 sentences to write for classroom misconduct.

John Doe refused to write the sentences as instructed by the teacher or to take "the paddle" as an alternative.

85. John Doe told the teacher who tried to discipline him "No I ain't doing nothing and you ain't going to give me no licks."

86. As a disciplinary choice, defendant Powell offered plaintiff John Doe his choice of writing sentences, two hours after school detention or three days suspension. John Doe chose suspension for three days.

87. Defendant Powell did not know plaintiff Arnold was the mother of John Doe when John Doe elected school suspension.

## CONCLUSIONS OF LAW

1. The plaintiffs have filed their complaint timely and this court has jurisdiction of those claims which have not been dismissed. *Arnold v. Board of Educ. of Escambia County*, 880 F.2d 305 (11th Cir. 1989).

2. As in any civil case, the plaintiffs bear the burden of proving the allegations of their complaint that the defendants violated the plaintiffs' constitutional rights of due process, free exercise of religion, privacy, and equal protection under the first and fourteenth amendments and claims of civil conspiracy and retaliation.

3. To prove a claim of conspiracy under 42 U.S.C. § 1985, the plaintiffs must show racially-based animus. *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The record is devoid of any evidence of any racially-based act, and the plaintiffs themselves state that they do not believe their race was a factor as alleged in the complaint. As a matter of law, the Section 1985 claims are due to be dismissed summarily for failure of the plaintiffs to present any evidence of a class-based animus on the part of any defendant.

4. The linchpin of the complaint is that defendant Rose and Powell compelled or forced Jane Doe to have an abortion and compelled John Doe and Jane Doe to forbear from disclosing to their parents Jane's pregnancy. The Court concludes, however,

that the minor plaintiffs themselves chose not to tell their parents. Jane Doe had left the home where she lived with her mother claiming her step father abused her. John did not know how to locate his father and Jane had reason to believe relatives had told her father, who lived without the state.

The Court further concludes that defendant Kay Rose encouraged Jane Doe to contact her mother, which Jane Doe was scared to do and refused. Similarly, John Doe did not want to tell his mother that he had again gotten Jane Doe pregnant. Kay Rose presented alternatives to abortion and brought in other social workers to provide a full range of choices to Jane Doe about any decision she would make about her pregnancy. Kay Rose did not compel John Doe to assist in procuring an abortion for Jane Doe. Jane Doe insisted that she wanted an abortion even as defendant Rose suggested to her that she had other choices. Defendant Powell had no contact with Jane Doe and only made a loan of approximately twenty dollars to John Doe which John Doe was not compelled to use for any purpose.

Compulsion or coercion can mean physical force or actions by which one is deprived of one's free will. *See Black's Law Dictionary* 234, 260 (5th ed. 1979). In this case, the students allege that they were compelled and coerced to have an abortion and directed not to consult with their parents. The facts from the plaintiffs themselves show that the students made the abortion decision. Options to abortion were suggested to them by the defendant Rose and by others brought into the discussion to assist the minors by defendant Rose. In addition to defendant Rose, the plaintiff, Jane Doe, continued to seek the advice of others about what she should do. Some were against abortion and some were not permitted even to discuss abortion as an option, but in the end, Jane Doe made her own decision and that was to abort. The allegations of coercion or compulsion either to have an abortion or to refrain from notifying parents regarding the pregnancy are simply not supported by the facts.

5. The pregnancy counselling provided by Kay Rose to Jane Doe did not interfere with parental beliefs or parental guidance. *Cf. Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (Fourteenth Amendment protects right of parents to educate their children).

6. In 1986, when Jane Doe was fifteen and consented to an abortion, the Alabama legislature provided that minors as young as 14 could consent on their own to any medical procedure including abortion. Ala.Code § 22–8–4 (1975).

7. No federal or state statute or other rule or regulation requires parental notification by school officials of pregnancy or abortion plans of minors reporting pregnancy or abortion plans to public school officials. *See Arnold v. Board of Educ. of Escambia County,* 880 F.2d at 314.

8. In 1986, the decision of Jane Doe to seek parental guidance was within her sole discretion, and she did not want that guidance. She was free to make her decision without parental guidance. Further, there is no constitutional mandate that public school counselors notify the parents of a pregnant minor student of the pregnancy or abortion plans. *See id.*

9. Where parents abuse, neglect, abandon or otherwise fail in their guidance role, the state may, by default, have some responsibility for children's well-being. *See, e.g., Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).

10. John Doe has no constitutionally protected privacy rights regarding the aborted fetus. *Arnold v. Board of Educ. of Escambia County,* 880 F.2d at 314.

11. No defendant, by discussing abortion or loaning money to the minor plaintiffs, unconstitutionally interfered with any plaintiff's free exercise of religion or privacy. *Cf. Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *See also Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

12. John Doe complains that his school suspension of three days was defendant Powell's retaliation for Helen Arnold's filing this action, but the undisputed facts show that defendant Powell did not know that plaintiff Helen Arnold was the mother of John Doe until after the suspension began. Therefore, retaliation as the motivation for the suspension is eliminated. The "causal link" between the plaintiff's suspension from school and defendant Powell's knowledge of the lawsuit is missing. *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491 (11th Cir.1989).

13. The claims of the plaintiffs are not only unsupported, but in fact are contradicted by the evidence, most of which comes from the plaintiffs themselves.

14. In evaluating the evidence under Fed.R.Civ.P. 56(c), a trial judge must grant summary judgment if the evidence offered demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

15. The moving party has the initial responsibility of informing the court of the basis for its motion, and identifying "the pleadings, depositions, answers to interrogatories, and admissions file, together with the affidavits, if any," which the movant believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). The defendants have fulfilled this requirement.

16. In determining whether a genuine issue of material fact has been raised, not only must there be no genuine issue as to evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them. However, where there is nothing more than a metaphysical doubt as to the material facts, summary judgment should be granted. *Matsushita Electric Indus. Co. v. Ze-nith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

17. Once a movant meets that burden and establishes a prima facie case for summary judgment, the opposing party must adduce enough evidence to support a jury verdict in its favor. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510–11 (citing *First Nat'l Bank Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)); *see* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (2d ed. 1983). Plaintiffs have failed to carry their burden in opposition to defendants' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, it is ORDERED that defendants' motion for summary judgment be and hereby is GRANTED, costs taxed to plaintiffs. Judgment will be entered by separate order.