Lisa GRAY and Kristal Nelson, a Minor *v.*
The GLADNEY CENTER

CA 01-1099                                      87 S.W.3d 797

Court of Appeals of Arkansas
Division IV
Opinion delivered September 25, 2002

*James Law Firm*, by: *Patricia A. James* and *Clay T. Buchanan*, for appellant.

*Wright, Lindsey & Jennings LLP*, by: *H. Keith Morrison*, for appellee.

JOHN F. STROUD, JR., Chief Judge. Kristal Nelson and Lisa Gray, as next friend of Kristal Nelson, appeal the decision of the trial judge to deny their petition to set aside an interlocutory order of adoption. We affirm the trial court's decision denying the petition.

In the early morning hours of July 17, 2000, Kristal Nelson, an unmarried seventeen-year-old pregnant girl, was admitted to UAMS in labor. She arrived at the hospital accompanied by her friend, Crystal Roe; Nelson's parents were unaware that she was pregnant. Nelson ultimately was required to deliver her baby boy by Cesarean section. As Nelson was being prepped for surgery, Roe raised the issue of adoption to one of the nurses. As a result of that inquiry, Ginger Stafford, a social worker from UAMS, met

with Nelson later that same day and provided Nelson with a list of adoption agencies, telling her to look them over and that she would come back the following day to see if Nelson had made a decision. The Gladney Center for Adoption was selected, and Jennifer Martin, a representative from Gladney, flew from Dallas to Little Rock on July 18, 2000, and met with Nelson, Roe, and Nelson's sister.

Martin spent the night in Little Rock and returned to see Nelson the following day, July 19. It was determined that due to her age, a guardian ad litem was needed for Nelson, and Elizabeth Andreoli agreed to serve in that capacity. Andreoli came to Nelson's hospital room on the afternoon of July 19; Nelson executed the Waiver of Service, Appearance, and Consent to Temporary Guardianship and Adoption at approximately 2:15 p.m. on that day; and it was filed of record with the Pulaski County Probate Court at 3:35 p.m. that afternoon. The Order Appointing Temporary Guardian was filed at 3:42 p.m. The child was placed in the custody of the adoptive parents on July 31, 2000. An interlocutory decree of adoption was entered on August 2, 2000, and an order terminating temporary guardianship was entered on August 15, 2000. Appellant Lisa Gray learned of her daughter's pregnancy and subsequent delivery on August 14, 2000. On August 16, 2000, Gray and Nelson filed a motion to withdraw the adoption consent, and on August 30, 2000, they filed a motion to set aside the interlocutory order of adoption. After holding a hearing, the trial judge denied the motion to set aside the interlocutory order of adoption, and this appeal ensued. Appellants' two arguments on appeal are that the trial court erroneously interpreted the adoption statutes and case law to place an additional element of proof on appellants and that the trial court erred in finding that Nelson's consent was not obtained under duress.

The standard of review for adoption proceedings was set forth in *In the Matter of the Adoption of J.L.T.*, 31 Ark. App. 85, 87-88, 788 S.W.2d 494, 495 (1990):

> In adoption proceedings, this Court reviews the record *de novo*, but we will not reverse the probate judge's decision unless it is clearly erroneous or against the preponderance of the evidence,

after giving due regard to his opportunity to determine the credibility of the witnesses. In cases involving minor children a heavier burden is cast upon the court to utilize to the fullest extent all its power or perception in evaluating the witnesses, their testimony, and the children's best interests. This Court has no such opportunity, and we know of no case in which the superior position, ability, and opportunity of the probate court to observe the parties carry as great a weight as one involving minor children.

(Citations omitted.)

■ ■ A consent to adoption cannot be withdrawn after the entry of a decree of adoption; however, a consent to adopt may be withdrawn within ten calendar days after it is signed or the child is born, whichever is later, by the filing of an affidavit. Ark. Code Ann. § 9-9-209 (Repl. 2002).

Arkansas Code Annotated section 9-9-216(b) (Repl. 2002) provides:

Subject to the disposition of an appeal, upon the expiration of one (1) year after an adoption decree is issued, the decree cannot be questioned on any ground, including fraud, misrepresentation, failure to give any required notice, or lack of jurisdiction of the parties or of the subject matter unless, in the case of the adoption of a minor, the petitioner has not taken custody of the minor or, in the case of the adoption of an adult, the adult had no knowledge of the decree within the one-year period.

Consent to adoption can be withdrawn after an interlocutory order only upon a showing of fraud, duress, or intimidation. *Martin v. Martin*, 316 Ark. 765, 875 S.W.2d 819 (1994); *Pierce v. Pierce*, 279 Ark. 62, 648 S.W.2d 487 (1983).

We first address appellants' second argument, that the trial court erred in finding that Nelson's consent for the adoption was not obtained under duress. Appellants contend that "[c]ircumstances combined to place [Nelson] under duress: the physical pain she was suffering; the medication she was given; the constant pressure to make a decision placed on her by Ginger Stafford, Jennifer Martin, and Elizabeth Andreoli."

Although it is undisputed that Nelson made no attempt to withdraw her consent within the ten-day period, the testimony concerning the circumstances of Nelson's execution of the consent for adoption and the ten-day period that followed is in conflict. Although Roe was the person who mentioned adoption to one of the nurses, Nelson stated that she was in the room when this statement was made. Nelson testified that Stafford's first visit on Monday lasted about forty-five minutes, and that she was drowsy and slept while Roe did most of the talking. She did not recall if she met with Stafford on Tuesday. She said that no one from UAMS tried to talk her into selecting Gladney. Nelson said that she thought that Roe was the person who had contacted Gladney, and that Martin arrived on Tuesday evening with a folder of information. Nelson told Martin that she was staying with Roe because her parents did not know she was pregnant. She said that her sister and Roe were present when she met with Martin, and that they did most of the talking. Nelson said that she did not make a decision at that time. She said that she was focused but "not a whole lot," but she understood what was talked about.

According to Nelson, when Martin came to the hospital on Wednesday, Roe told her that they had selected Gladney, but Nelson did not believe that she said that she wanted to go forward with the adoption. The first time Nelson met Andreoli was when she arrived at the hospital on July 19; Martin, Roe, Nelson's sister, and the notary were all in the room while Andreoli discussed the documents with Nelson. Nelson said that Andreoli read through the consent form, told her to "look over it," and asked if Nelson had any questions; Andreoli also told her that she would have ten days in which to change her mind. Nelson said that she "skimmed" through the form, not reading it word for word, but that the words she read did make sense to her and she did not have any questions at the time. She said that during this time her stomach hurt, she was sleepy, and she was crying. Although she testified that she was in severe pain during her hospital stay, Nelson did not know if she was given any pain medication while in the hospital.

Nelson left the hospital against medical advice on Thursday afternoon. She said that her father had called Roe, believing that Nelson was staying there, and told her that he wanted Nelson to come home. Nelson said that she had to walk on her tiptoes because she was sore, and when her father asked her what was wrong, she told him that she had hurt her back. The following Tuesday, Nelson left with her family on a week-long trip to Las Vegas. She said that she thought about changing her mind during the ten-day period, but that she could not call because she was in Las Vegas and had left all of the paperwork with the telephone numbers with Roe. She said that she was scared and thought it was really too late to do anything. However, on cross-examination, she said that she never asked Roe for Andreoli's telephone numbers when she talked to her during her trip to Las Vegas. Nelson said that she received a profile of the adoptive family when she returned from Las Vegas, and she called and talked to them. Nelson's mother learned of her pregnancy when she found a hospital bill in Nelson's purse after the family returned home from Las Vegas. They contacted Andreoli but were told that the ten-day period had expired. Nelson testified that no one tried to talk her into choosing adoption, that it was fair to say that she made the decision herself, and that she did not tell anyone about changing her mind until after her mother found the hospital bill and knew about the pregnancy. She testified that she wished she could do it all over, and that she just wanted her son back.

Dr. Sam Turner, who never treated Nelson but only reviewed her medical records, testified that Nelson was given an inhaled anesthetic during surgery and was given two injections of pain-management drugs after surgery. She was also given two shots of Demerol on Monday in twelve-hour intervals. After that, she was given hydro-oxycodone tablets, or Tyelox, over the next several days for pain control. On July 19, the date she signed the consent for adoption, Nelson was given two Tyelox tablets at 6:26 a.m. and one at 6:30 p.m.; other than the medication given at 6:26 a.m., no medications with a sedative effect were administered prior to Nelson signing the consent. Turner said that he was concerned that an infection Nelson developed after her Cesarean sec-

tion caused her temperature to spike and required antibiotics. He said that spiking temperatures do cause mental-status changes in some people, although he could not say that Nelson was so affected. It was his opinion that the decision concerning the adoption of her child should have been delayed until she was in a "healthy state of mind."

Roe testified that she was the person that first raised the issue of adoption; however, she stated that Nelson was not in the room when she brought up the topic. She said that when Martin arrived on Tuesday, Nelson was still "droopy" and had been complaining of pain during the day. She said that Nelson was still drowsy and sleepy when the consent for adoption was being reviewed with her. She believed that Nelson was confused when Martin asked her if adoption was what she wanted to do and Nelson responded affirmatively. Roe said that she brought up adoption because she thought that was the only choice other than telling Nelson's parents, which she believed that Nelson was afraid to do. Roe said that she never heard anyone from UAMS or Gladney pressure Nelson into signing the consent and that she thought Nelson knew what the consent meant. Roe acknowledged that Andreoli reviewed the provision concerning the ten-day period in which Nelson could withdraw her consent.

Stafford testified that she was called to meet with Nelson because Nelson wanted to place her baby for adoption. When she asked Nelson why she wanted to place her baby for adoption, Nelson told her that she lived with her sister and had not had contact with her parents for over a year, and that she could not afford to take care of a baby. Nelson asked for a list of adoption agencies, which Stafford provided to her. Nelson told her that she wanted to talk to her sister; when Stafford returned to see Nelson the following day, she was told by Nelson that she had chosen Gladney. Stafford said that either Nelson or her sister contacted Gladney and that she then called Gladney and was told that a representative was coming to Arkansas to meet with Nelson. Stafford next returned to see Nelson when the consent form was being signed. She said that when she arrived, the form had already been read and Nelson was about to sign the consent. Stafford said that

she asked Nelson if she understood what she was doing, and she told her that she did. From what she could observe, Stafford said that Nelson appeared alert and coherent during all of their meetings, and that she was not aware that Nelson was on any medication. Stafford said that she did not feel that she pressured Nelson, but that her role was to stay in contact with the patient and determine what she wanted to do.

Martin testified that she flew into Little Rock after speaking with Nelson on the phone. When she arrived at the hospital, she met with Nelson, Nelson's sister, and Roe and talked about Nelson's adoption plan and delivery. Martin said that she talked with Nelson about her future plans, her baby, and other options she considered. She said that Nelson told her she lived with her sister and that her parents lived out of state, and Martin had no indication that Nelson was not being truthful. Martin said that although she could tell that Nelson was tired, which was normal after a delivery, Nelson responded to her open-ended questions with full answers. Martin said that Nelson refused pain medication that night and told her that she had not been taking anything for pain, that there was only saline and antibiotics in her IV. Martin called her twice Tuesday night, once to give Nelson her hotel number and a second time to let Nelson know that she had changed rooms.

Martin met with Nelson again on July 19 and Nelson reconfirmed her decision to place her son for adoption. Martin told her that they were going to have a guardian ad litem appointed for her because of her age, that she would be back with the papers that afternoon, and that Nelson had ten days to change her mind after she signed the papers. Martin testified that Nelson said she was comfortable with Martin staying in the room while Andreoli reviewed the paperwork with her. Martin said that after Andreoli gave Nelson the paperwork to read, she told her to read it out loud and explain it to Nelson, which Andreoli did. Martin asked Nelson if she was in any pain before she signed the consent because she did not want her to sign something just to get a pain pill. Martin testified that she did not feel that she was pressuring Nelson, that she told her that she could tell her to leave at any

time. She said that she did not wait for Nelson to call her because she always followed up on her clients, but she was not going to force anything if someone did not want to follow through with an adoption. The following Monday, Martin provided Nelson with information about the adoptive parents and also set up a call between the parties. Martin said that Nelson sounded upbeat and positive after the conversation with the adoptive parents, but she still reminded Nelson that she had until July 31 to revoke her consent.

Andreoli testified that she agreed to act as Nelson's guardian ad litem, although she had never served as a guardian ad litem in an adoption case. She met with a partner in her firm and her supervising attorney to discuss her role. Andreoli said that when she arrived at the hospital, Martin and Roe were in Nelson's room. She introduced herself and told Nelson that she was there to protect her interests and to make sure that she knew what rights she was relinquishing. She asked Nelson if anyone had forced her to place her child for adoption and told her that she had ten days to revoke her consent. Nelson told Andreoli that her parents lived out of state. Andreoli reviewed the waiver of rights line by line, and told Nelson that she would have no right to see her baby again when Nelson asked if she would be able to see the baby after he was adopted. Andreoli then read the consent form and then gave it to Nelson, who appeared to be reading it to herself. Andreoli said that although Nelson was neither cheerful nor talkative, she was alert and seemed to be able to focus. Although she did not know what medication Nelson was taking, Andreoli did not detect that Nelson was groggy or under the influence of any medication, and she testified that her eyes were clear and her speech was coherent. She said that when she left, she was comfortable that the decision to place the baby for adoption had been made by Nelson. Andreoli testified that her role as guardian ad litem was to protect Nelson's interest by making sure that she was making the decision voluntarily, that she knew she could revoke her consent, and that she knew the procedure to revoke her consent.

■ We hold that the trial judge's finding that Nelson was not under duress when she executed the consent for adoption is not clearly erroneous. In this case, the trial judge found that Nelson was visited by Stafford and Martin a total of six times over the four days that she was hospitalized, that the social workers met with Nelson only after she requested assistance to facilitate her baby's adoption, and that neither of them attempted to force Nelson to place her child for adoption. In fact, Nelson herself testified that no one forced her into choosing adoption and that it was fair to say that she made the decision herself.

■ Appellants also argue that the trial judge erroneously interpreted the adoption statutes and case law to place an additional burden on them. Specifically, appellants argue that the trial judge essentially required them to show that Nelson's consent was obtained under duress and that the duress continued beyond the ten-day revocation period. We disagree. Consent to adoption can be withdrawn after an interlocutory order only upon a showing of fraud, duress, or intimidation. *Martin, supra; Pierce, supra.* The interlocutory order of adoption was entered on August 2, 2000, and given the above discussion that Nelson was under no duress at the time she executed the consent to adoption, appellants' argument must fail.

Affirmed.

ROBBINS, J., agrees.

HART, J., concurs.

JOSEPHINE LINKER HART, Judge, concurring. I write separately to express my concerns about a statutory adoption procedure that allows a guardian ad litem to consent to the adoption of a newborn baby born to a minor without the minor's parents being notified of the appointment of the guardian ad litem or of the adoption.

With exceptions not relevant here, "a petition to adopt a minor may be granted only if written consent to a particular adoption has been executed by . . . [t]he mother of the minor. . . ." Ark. Code Ann. § 9-9-206(a)(1) (Repl. 2002). If the

parent is also a minor, consent to adoption must be signed by a guardian ad litem. Ark. Code Ann. § 9-9-208(c) (Repl. 2002). Further, a waiver of the minor's rights as a parent must be

> signed by a guardian ad litem who is appointed to appear on behalf of the minor parent for the purpose of executing such a writing. The signing shall occur in the presence of a representative of an agency taking custody of the child, or in the presence of a notary public, whether the agency is within or without the state, or in the presence and with the approval of a judge of a court of record of this state or any other state in which the minor was present at the time it was signed.

Ark. Code Ann. § 9-9-220(b) (Repl. 2002).

These statutes, however, do not require notification of the parents of the minor mother at any stage of the proceedings. I recognize that we do have general guardian statutes. There, a "guardian" is one appointed by a court to have the care and custody of an incapacitated person; whereas, a "guardian ad litem" is one appointed by a court in which a particular proceeding is pending to represent a ward in that proceeding. Ark. Code Ann. § 28-65-101(3) and (8) (1987). The authority of guardians has been restricted in certain areas. For example, a guardian cannot authorize the termination of parental rights without first filing a petition and receiving express court approval. Ark. Code Ann. § 28-65-302(a)(1)(D) (Supp. 1999). Further, the guardianship statutes require that the parents be notified of any hearing for the appointment of a guardian, if the incapacitated person is a minor. Ark. Code Ann. § 28-65-207(b)(2) (Supp. 1999).

I note that there is no statute requiring notice to the parents of the minor for whom a guardian ad litem is appointed. In current form, our adoption statutes allow the guardian ad litem to supplant the parents' authority over the minor mother without her parents' knowledge of the appointment or the execution of the consent to adoption. Such deficit is especially troubling when the court-appointed guardian ad litem was selected and her fees paid for by the private adoption agency. Even more troubling in this case is the lack of understanding this guardian ad litem had of her duties. When describing her role, she testified as follows:

> I was not protecting [the minor mother's] interests as they
> related to placing her baby for adoption. That was not my role.
> Protecting her interest was to make sure that she was making this
> decision voluntarily, that she knew she could undo the [c]on-
> sent, and that she knew how to do it.

When reviewing the procedure enacted by this State that allows a guardian ad litem of a minor to consent to the adoption of the minor's newborn within forty-eight hours of its birth without notification to her parents, one must ask who the State has protected. The newborn, the minor mother, and the minor's parents are not necessarily protected by allowing a guardian ad litem hired by the adoption agency to represent the minor mother. In fact, the guardian ad litem may have a conflict of interest, serving cross-purposes facilitating the adoption without necessarily considering the minor mother's interest in keeping the child. Whether this attorney misunderstood her role in the proceeding or was derelict in the application of her duties, I cannot find that her conduct amounted to duress as is required by our statutes before an adoption may be set aside.

With limited exceptions, notification of the minor's parents would be required if she wanted to have an abortion or marry the father of the child. Such notice could be dispensed with only after a court hearing. *See* Ark. Code Ann. §§ 20-16-801, -805 (Repl. 2000); Ark. Code Ann. §§ 9-11-102, -103 (Repl. 2002). Our adoption statutes lack such provisions.

In the case at bar, the unaddressed issue is the due process violation of the parents of the minor mother. Given the paucity of safeguards for minor mothers and the lack of notice to the parents of minor mothers, I am concerned that the statutory procedure fails to provide fundamental due process, and thus, cannot withstand constitutional challenges. The appointment of the guardian ad litem, without notice to the minor's parents, deprived them of their right to counsel and to advise their daughter prior to the appointment of the guardian ad litem and the entry of the consent to adoption. Although not argued either in the probate court or on appeal, and thus not a basis for an appeal to this court,

it has been recognized by the United States Supreme Court that parents cannot be denied their parental rights without due process of law. Even our highest court has consistently recognized parents' right to direct the rearing of their children, stating as follows:

> We have believed in this country that this process, in large part, is beyond the competence of impersonal political institutions. Indeed, affirmative sponsorship of particular ethical, religious, or political beliefs is something we expect the State *not* to attempt in a society constitutionally committed to the ideal of individual liberty and freedom of choice. Thus, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include *preparation for obligations the state can neither supply nor hinder.*" *Prince v. Massachusetts, supra,* 321 U.S., at 166, 64 S.Ct., at 442 (emphasis added).

> Unquestionably, there are many competing theories about the most effective way for parents to fulfill their central role in assisting their children on the way to responsible adulthood. While we do not pretend any special wisdom on this subject, we cannot ignore that central to many of these theories, and deeply rooted in our Nation's history and tradition, is the belief that the parental role implies a substantial measure of authority over one's children. Indeed, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsburg v. New York, supra,* 390 U.S., at 639, 88 S.Ct., at 1280.

*Bellotti v. Baird,* 443 U.S. 622, 638 (1979).

Whether the procedure followed in this case meets constitutional standards is not before this court. Thus, I am constrained to concur.