IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 23, 2005 Session

## In re A.J.H.

**Appeal from the Juvenile Court for Davidson County**
**No. 2219-68191      Betty Adams Green, Judge**

_____

**No. M2005-00174-COA-R3-PT - Filed November 28, 2005**

_____

The child who is the subject of this Petition to Terminate Parental Rights, A.J.H., is the latest of five children born to the mother, M.H.  A.J.H. is the fourth child of D.H., the father.  At the conclusion of an initial investigation by DCS personnel, A.J.H. was removed from the parents' custody immediately after birth and has remained with his foster parents since that removal.  The father appeals the juvenile court's termination of his parental rights as well as its refusal to consider the paternal grandparents' petition for custody.  We reverse and vacate the order of termination and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Nick Perenich, Nashville, Tennessee, for the appellant, D.H.

Paul G. Summers, Attorney General and Reporter; Elizabeth C. Driver, Assistant Attorney General, for the appellee, the State of Tennessee.

Guy McClure, Nashville, Tennessee, guardian ad litem.

**OPINION**

**I.  FACTS**
### A.  A.J.H. comes into custody

A.J.H. was born in Metro General Hospital in May of 2002.  Based on information given by both parents as well as child protective authorities in the parents' home state of Michigan, the Department of Children's Services ("DCS") intervened and filed an emergency petition seeking

custody of A.J.H. The petition alleged, and the parents did not dispute, that A.J.H.'s father had been accused of child sexual abuse by one of his stepchildren in Michigan, and that, as an indirect result of these allegations, both parents' rights as to at least three children were terminated. The Petition further alleged that the parents were "evasive" in answering questions posed by DCS case manager Gerald Randolph. The father eventually told Randolph that he had been advised by an attorney to have children outside the state of Michigan in order to avoid further termination proceedings in that state. Of particular note in the Petition for Custody with Request for Emergency Removal, which was made an exhibit to the termination proceeding, is the following allegation:

> E. The Department of Children Services received copies of court orders, petitions and order of dispositions of termination of parental rights from the St. Claire, Department of Children Services, in Michigan. The parents' rights have been terminated for all of their children due to substantial risk of physical harm and sexual abuse. In addition, [father and mother] have failed numerous times to abide and to follow through on court orders.

The record includes documents obtained from Michigan Circuit Court, Family Division, St. Claire County dating back to 2001, when a Michigan attorney referee recommended terminating the mother's rights to three children, A.S., born May 15, 1996; S.S., born January 15, 1999, and A.H., born May 10, 2000. D.H., the suspected perpetrator and father of the child in the matter before this Court, was never convicted of sexual abuse, and no record of a formal charge or conviction in Michigan appears in the record before us. Nevertheless, as appears next in the documents, by Order entered March 12, 2001, D.H.'s parental rights were relinquished as to A.H.

## B. First Permanency plan is drafted and transfer is attempted

DCS drafted the first of three permanency plans which was dated May 31, 2002. Despite the parents' extensive history in Michigan Family Court, this plan contained the joint goals of adoption and reunification. Two revisions were made to this plan, the first occurring on May 8, 2003, one week before the petition to terminate, and the second on April 10, 2004, several months prior to the final hearing on the state's petition, however, the goals and the requirements of the plan remained the same. D.H. did not participate in the plan's original staffing, having returned to Michigan three days after A.J.H. was placed in state custody. The plan required that D.H. submit to a psychosexual evaluation and follow the recommendations, submit to a clinical diagnostic evaluation and follow recommendations, provide proof of employment, obtain a home evaluation and "comply with the provisions and guidelines set forth by Davidson County Juvenile Court and DCS." By order of July 10, 2002, the Juvenile Court attempted to transfer this case to Michigan, but the Michigan courts declined to exercise jurisdiction, and the matter returned to the Davidson County Juvenile Court.

## C. The Department and D.H. take steps to comply with the permanency plan.

In August of 2002, D.H. returned to Nashville, apparently in an effort to regain custody of his son. On August 7 he informed case manager Angela Hilliard that he had returned to Tennessee. Although he had no job and was living in his truck, he expressed his intent to comply with the permanency plan requirements. On September 25 the Juvenile Court approved the May 31 permanency plan. On or about October 10, 2002, D.H. requested that DCS make an appointment for the psychosexual evaluation. According to Hilliard's testimony, she made the arrangements one week later. D.H. cancelled this evaluation on November 7:

> Q. On November 7th, 2002, did you talk with [D.H.] about the evaluation?
> A. Yes.
> Q. What did the conversation consist of?
> A. [D.H.] stated that he had canceled his appointment because it was very expensive.
> Q. And did you advise him as to how he could receive assistance?
> A. Yes. I stated that I would seek assistance for him to get the evaluation paid for.
> Q. Were there some concerns with regard to [D.H.'s] lack of insurance?
> A. Yes.
> Q. What did you do to assist him or advise him about insurance?
> A. We talked about TennCare, and I had [given] him an application to fill out. I think he did indeed, fill it out and send it back in. They told him he made too much money, so I gave him a list of numbers and places who did offer medical insurance.

These monetary concerns would become a recurring theme throughout DCS contact with this parent. According to the permanency plan, the psychosexual evaluation was to be completed by December 31, 2002. Ms. Hilliard testified that she requested "flex funding" for the psychosexual evaluation on December 12, 2002. The psychosexual evaluation was eventually performed on March 1, 2003. The evaluator made the following recommendations in her report:

1) Based on the previously noted factors and information available at the time of this evaluation, no complete risk assessment can be completed at this time as [D.H.] failed to submit to a polygraph assessment. Therefore, he is assessed at a high risk as all of his children have been removed from his custody and rights have been terminated, there is a reported history of (Bipolar Disorder) and a psychiatric hospitalization, there is reported alcohol and drug abuse history with no treatment follow up, and a sordid employment history. If [D.H.] completes a polygraph assessment more complete recommendations may be submitted.

2) [D.H.] may benefit from employment counseling to assist him in finding stable employment, setting career goals, and maintaining vocational pursuits.

3)  This evaluation did not assess [D.H.'s] physiological responses to healthy and deviant sexual stimuli; however, further clarity in this area may be obtained by a plethysmograph or an Abel-Screen evaluation. A referring therapist for this type of assessment may be located by contacting this evaluator.

4)  Should issues of reunification between [D.H.] and his children become a viable focus of court deliberations, it is recommended that reunification occur under therapeutic direction and with respect to the therapeutic needs of all involved parties. Reunification efforts would require that [D.H.], his wife, and his child receive separate therapeutic support, guidance, and an initial assessment of their readiness for closer involvement considering the traumatic and conflicting nature of the issues in this case. In addition, [D.H.] should attend a psychiatric evaluation to assess the current need for medication as he previously was placed on medication for a serious mental illness.

## D.  The Department's efforts at assessing D.H.'s issues as identified in the evaluation

According to Case Manager Hilliard's testimony on cross-examination, funding was not requested for any follow-up evaluation until June 2003. She provides the following testimony by way of explanation:

Q.  Now why wasn't that funding asked for in the five months prior to June 2003?

A.  At some point in time – and it's not detailed. But at some point in time our flex funding stops. For a child they only allow so much money. So I'm going to say that's the problem, but I don't know between that time if they didn't have the funding.

Q.  It may well have been a lack of funding?

A.  I'm not going to say that's why, but it could have been, but like one child is only allowed so much money for different funds, either parent.

Nonetheless, on May 15, two months after the psychosexual evaluation and a full month before the request for funding, the Department of Children's Services filed its Petition to Terminate the Parents' Rights. In the meantime, D.H. had completed two parenting classes and Juvenile Court Referee Michael O'Neill had entered an order May 3, 2003, requiring D.H. to "submit to plethysmograph and/or Abel-screen evaluation."

On August 4, 2003, case manager Hilliard composed a letter which she hand-delivered to D.H. The letter provided phone numbers for appointments for a psychological evaluation, a parenting assessment and an Abel-screening. Ms. Hilliard wrote, "The parenting assessment and psychological evaluation is being paid for through flex funding. Please let me know if you need any assistance." The parenting assessment was completed. The report, which issued on October 29, 2003, contained the following recommendations:

Test results do indicate some situational depression, however, he is denying any significant psychopathology. He does seem to have difficulties with coping skills and following through with job stability and maintaining stable living situations. Overall, [D.H.] does have several hurdles prior to being considered as a viable option as a parent.

Based on the test results, clinical interview, and review of medical records, the following recommendations are presented. Prior to being considered as a custodial parent:

1.  [D.H.] needs to complete the requirements regarding the psychosexual to rule out his risk factors for being a perpetrator.

2.  [D.H.] needs to exhibit an ability to maintain stable housing and job security for a reasonable period of time.

3.  Out patient therapy would be beneficial in order to help [D.H.] develop better coping skills and strategies in order to follow through with taking care of himself. He does acknowledge he does not know how to accomplish things people are asking him to.

4.  Possible medication to address impulsivity and difficulty concentrating due to ADD may be helpful[.]

The Abel-screening was finally conducted February 22, 2004. The report from that assessment gives the following description of the procedure:

The Abel Assessment is a psychological test designed to provide an objective measure of the client's sexual interests and subjective information about the client's sexual arousal patterns and sexual history. The Abel assessment covers the following four areas:

•  Objective measures taken beyond the client's awareness of sexual interest in slides depicting children, adolescents, and adults, and sadomasochism toward adults.
•  The client rates his subjective sexual arousal to the same slides depicting children, adolescents, and adults, and sadomasochism toward adults.
•  A questionnaire in which the client addresses topics specifically designed for the evaluation of possible and known sex offenders.
•  When applicable, probability values are reported which indicate that a client's responses match a set of characteristics of known sex offenders.

In summarizing the results from the screening the report states:

> The results of the components of the Abel Assessment were normal for [D.H.], including the objective measures of sexual interest, the self-report of sexual arousal, and the various parts of the questionnaire. The probability values (that [D.H.'s] responses matched a set of characteristics of admitted pedophiles or denying pedophiles) were not significant.
>
> It is important to note that the information from the Abel Assessment should not be interpreted as indicators of guilt or innocence regarding any specific sexual act. Evaluations of sexual interest and sexual arousal are designed to determine treatment needs and the client's risk level. The information from this assessment should be used in conjunction with other tools commonly utilized in the evaluation of sexually deviant behaviors.

No clinical psychological evaluation was performed. In addition, the Abel report was not forwarded to the original psychosexual evaluator for consideration. When the case manager had collected these reports, according to her testimony, she simply placed them in her file. No additional action was taken. The termination petition made the following averments:

> The child has been removed pursuant to a dependency neglect proceeding and placed in the custody of the Department of Children's Services. The Department of Children's Services made reasonable efforts to prevent removal of the child or the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal. For a period of four months following the removal, the Department of Children's Services made reasonable efforts to assist the Respondents, [M.H.] and [D.H.], to provide a suitable home for the child, but the Respondents have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely Respondents will be able to provide a suitable home for the child at an early date. Therefore Petitioner avers Respondents have abandoned the child.

As grounds for termination, the State alleged substantial noncompliance with the permanency plan requirements, persistence of conditions which led to the child's removal, or of other conditions which, in all reasonable probability, would cause A.J.H. to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the Respondents, still persist with little likelihood that these conditions will be remedied at an early date to enable prompt return of the child and early integration into a safe, stable and permanent home. Tenn. Code Ann. §36-1-113(g)(2),(3).

A.J.H. has been in the custody of foster parents since his birth a year prior to the filing of the State's petition. In fact, DCS had already discussed adoption with those foster parents twice.[1] The foster parents filed their Motion to Intervene as co-petitioners on May 15, 2003.

After an Order was entered setting the case for trial, the paternal grandparents, the Gonzalezes, filed a Motion to Intervene as petitioners for custody for A.J.H. The Juvenile Court denied the grandparents' Petition by Order entered September 3, 2003. That Order was affirmed on interlocutory appeal. *See Gonzalez v. State*, 136 S.W.3d 613 (Tenn.2004).

Following remand, the paternal grandparents filed a Petition of Custody, which the Juvenile Court agreed to consider in conjunction with the State's Petition to Terminate Parental Rights and the foster parents' intervening petition. After five days of hearings stretched over two months, the trial court found that the father's failure to maintain adequate housing, failure to provide proof of employment, failure to complete a psychosexual evaluation, and refusal to comply with court orders constituted substantial non-compliance with the Department's Permanency Plans. In addition the trial court found that grounds existed pursuant to Tennessee Code Annotated section 36-1-113(g)(3):

> [T]he child has been removed from the Respondent, and the conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the father, still persist; there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the Respondent in the near future; and the continuation of the parent-child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home. [D.H.] is no closer today to remedying the conditions that have prevented him from providing a home for this child than he was twenty-eight months before. In [D.H.]'s mind, every problem he has is someone else's fault: his parents raised him poorly; his caseworker failed to find him proper housing and employment; his probation officer failed to call him about the anger management class before violating his probation. If [D.H.] wants to raise a child, he must learn to be responsible and accountable for his own actions and/or failure to act.

The trial court specifically found that, considering the factors listed in Tennessee Code Annotated section 36-1-113(I), the best interest of the child weighed in favor of termination. The court decreed:

> That Respondents, [M.H.] and [D.H.], parental rights to the child, [A.J.H.] be and the same are hereby forever terminated and the complete custody, control and guardianship of the said child is awarded to the State of Tennessee, Department of Children's Services, with the right to place the child for adoption and to consent to

---

[1] The first of these conversations took place a month after A.J.H. was placed in their custody.

the adoption **in loco parentis.** The custody petitions of [paternal grandparents], as well as that of [foster parents], are hereby dismissed.[2]

D.H. alone appeals from the Order Terminating Paternal Rights, raising the following issues:

I.      Was the trial court in error when it declined to hear the custody petition of the grandmother prior to the termination of parental rights petition?

II.     Was the trial court in error when it dismissed the custody petition of the grandmother without consideration of the grounds that the petition to terminate parental rights was granted?

III.    Was the trial court in error when it considered the refusal of D.H. to submit to a polygraph examination as evidence of the non-compliance of his psychosexual evaluation?

IV.     Was the trial court in error when it found that the Department of Children's Services made reasonable efforts to assist D.H. in completing the parenting plan?

V.      Was the trial court in error when it applied a standard of "failed to substantially comply" with the permanency plan instead of "substantial non-compliance", as stated in T.C.A. 36010113(g)(2) as ground for terminating parental rights?

VI.     Was the trial court in error when it found that D.H. was in substantial non-compliance with the permanency plan?

VII.    Was the trial court in error when it found that persistent conditions existed that prevented the return of the child to D.H.?

VIII.   Was the trial court in error when it found that termination of parental rights was in the best interests of A.J.H.?

## II.     ANALYSIS

We will focus in the first instance on this father's efforts to comply with the permanency plans and make a lasting change of circumstances and the State's efforts to assist him in that endeavor, inasmuch as our resolution of the issues relative to substantial compliance and reasonable efforts controls the disposition of this appeal.

### A.  Standard of Review and Burden of Proof

The serious consequences and grave circumstances surrounding a termination of parental rights petition require due consideration of the standards applied by the trial court and by this Court.

In reviewing termination decisions this court has recognized that the existence of any one of the statutory bases will support a termination of parental rights. *See In re M.C.G.,* No. 01A01-9809-JV-00461, 1999 WL 332728, at *5 (Tenn.Ct.App. May 26,

---

[2] The Juvenile Court's Order was subsequently amended on the State's Motion; however, the amendment does not affect the Court's findings as to the father and paternal grandparents.

1999) (*no perm. app. filed*); *Department of Children's Servs. v. Darr,* No. 03A01-9706-JV-00213, 1998 WL 128874, at *3 (Tenn.Ct.App. Mar. 24, 1998)(*no perm. app. filed*); *Department of Human Servs. v. Manier,* No.01A01-9703-JV-00126, 1997 WL 675209, at *5 (Tenn.Ct.App. Oct. 31, 2997), *perm. App. Denied* (Tenn. Mar. 2, 1998). In the present case, therefore, we must affirm the trial court's judgment terminating the Mother's parental rights if the record contains clear and convincing evidence to support any of the bases found by the trial court. *See M.C.G.,* 1999 WL 332729, at *5; *Darr,* 1998 WL 128874, at *3; *Manier*, 1997 WL 675209, at *5 *See also In re Musick*, No. 03A01-9708-JV-00368, 1998 WL 136561, at *1 (Tenn.Ct.App. Mr. 27, 1998) (*no perm. app. filed*).

This court recently attempted to describe the clear and convincing evidence standard, explaining that

> [a]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier,* 905 S.W.2d 182, 188 (Tenn.App.1995); *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn.App.1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel v. Messier,* 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier,* 905 S.W.2d at 188; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn.App.1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer,* 559 S.W.2d 785, 787 (Tenn.1977); *Goldsmith v. Roberts,* 622 S.W.2d 438, 441 (Tenn.App.1981); *Brandon v. Wright,* 838 S.W.2d at 536.
> *M.C.G.,* 1999 WL 332729, at *6 (quoting *Bingham v. Knipp,* No. 02A01- 9803-CH-00083, 1999 WL 86985, at *3 (Tenn.Ct.App. Feb.23, 1999) (*no perm. app. filed*)).

*In re C.W.W.* 37 S.W.3d 467, 473-74 (Tenn.Ct.App.,2000)

Thus, if clear and convincing evidence establishes any one of the alleged grounds, and termination of parental rights is in the child's best interest, then our duty is to affirm the trial court. In the context of this determination, and always in the background of any termination order, lies the duty incumbent upon the trial court to determine whether reasonable efforts have been made by the department to either prevent the need for removal or make it possible for the child to return home. *See* Tenn. Code Ann. §37-1-166; *In Re C.M.M.,* No. M2003-01122-COA-R3-PT, 2004 Wl 438326,

**6-7 (Tenn.Ct.App.). *See also In Re: JLE,* M2004-02133-COA-R3-PT, 2005 WL 1541862, **11-12 (Tenn.Ct.App. June 30, 2005)(*no perm. App. Filed*).

### B. Substantial Noncompliance and Reasonable Efforts

This Court has observed:

> The Department is not required in every case to preserve or repair the parent-child relationship. However, once the Department undertakes this obligation, the courts should employ the same standards to determine whether the Department's remedial efforts have been reasonable.
>
> The concept of family is one of the fundamental building blocks of our society. Tenn. Code Ann. § 36-3-113(a) (2001). Parental autonomy is the cornerstone of this concept. *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935 (1977); *Davis v. Davis,* 842 S.W.2d 588, 601 (Tenn.1992); *State ex rel. Cihlar v. Crawford,* 39 S.W.3d 172, 182 (Tenn.Ct.App.2000). Thus, public policy strongly favors permitting parents to raise their children as they see fit, free from unwarranted governmental interference. *Bellotti v. Baird,* 443 U.S. 622, 638, 99 S.Ct. 3035, 3045 (1979); *Hawk v. Hawk,* 855 S.W.2d at 579; *State ex rel. T.H. v. Min,* 802 S.W.2d 625, 626 (Tenn.Ct.App.1990).
>
> Because of the importance of family relationships, the General Assembly has recognized that children should not be separated from their parents unless separation is necessary for the children's welfare or in the interest of public safety. Tenn. Code Ann. §§ 37-1-101(a)(3), 37-2-401(a) (2001). Even the statutes defining the circumstances when the State may intervene in the parent-child relationship reflect the General Assembly's policy decisions that separating parents and children should be a remedy of last resort, that the Department should make "reasonable efforts" to preserve, repair, or restore parent-child relationships whenever reasonably possible, and that the juvenile court must independently determine that the remedial efforts the Department proposes to engage in are reasonable.
>
> \*   \*   \*
>
> Once the Department separates a child from his or her parents, its first priority must be to restore the family unit if at all possible. Thus, the Department must make "reasonable efforts" to make it "possible for the child to return safely to the child's home." Tenn. Code Ann. §§ 37-1-166(a)(2),-166(g)(2). The Department may even delay termination proceedings if it decides it has not had sufficient opportunity to make "reasonable efforts" to provide the services needed to enable the child to return home safely. Tenn. Code Ann. § 36-1-113(h)(2). Finally, in cases where reasonable remedial efforts are required, the Department may support its claim that terminating a parent's parental rights is in a child's best interest by introducing evidence that the parent "has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2).

*In re C.M.M.* 2004 WL 438326, \*\*5 -6 (*footnotes omitted*).


The record is replete with evidence showing D.H.'s inability to keep gainful employment, maintain stable housing and obey court orders. He held numerous positions of employment of short duration prior to the filing of the State's petition. He admitted in testimony and in counseling to his inability to keep a job. Since his return to Tennessee and prior to sharing a residence with his girlfriend and her son, he spent several periods living out of his car, and even working at the adult entertainment establishment from which he was ultimately fired. The record shows that due to his sketchy history as a possible pedophile he was enjoined from continued cohabitation with his girlfriend and her son. He does not challenge the trial court's findings as to his chronic unemployment. He argues that the state's failure to help him obtain appropriate psychological assessment and treatment contributed to his inability to comply with the requirements for permanency.

D.H. argues that had the state been willing to pay for his initial evaluation from the beginning he would be better equipped to step up and address the barriers to permanency identified in the plan as initially staffed by DCS. He urges that DCS failed to assess any risks allegedly posed to the child and to treat his alleged psychological issues. Instead, they simply identified him as a potential pedophile and immediately pursued termination and adoption. DCS would urge that D.H.'s refusal to take the polygraph in connection with his first evaluation, his violation of prior court orders and his intention to continue driving without a valid driver's license are enough to establish grounds for substantial non-compliance and persistence of conditions. This Court has noted the intimacy between reasonable efforts expended for psychiatric evaluation and treatment and substantial compliance with permanency plan requirements:

> In many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support. *State Dep't of Children's Servs. v. Demarr*, 2003 WL 21946726, at \*10. Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not. *In re D.V.V.*, 2002 WL 225891, at \*8. However, the remedial responsibility does not rest solely on the Department's shoulders. Parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children. *In re R.C.V.*, 2002 WL 31730899, at \*12.
>
> We have already pointed out that the Department's obligation to make reasonable efforts to preserve, repair, or restore a parent-child relationship is not implicated in every termination proceeding. However, when the termination proceeding involves grounds that implicate the Department's obligation, establishing that it made reasonable efforts to reunite the child with his or her parents is an essential ingredient of the Department's case. In these cases, the Department has the

-11-

burden of proving its reasonable efforts even when the parent has not questioned the adequacy of its efforts. *See* Tenn. Code Ann. § 37-1-166(b).

*In re C.M.M.* 2004 WL 438326, *7 (Tenn.Ct.App.)

The linchpin of the father's argument on appeal, therefore, is the relationship between these failures on his part to comply with the permanency plan requirements and DCS's efforts to identify and treat the psychological issues which D.H. alleges are part and parcel of his inability to comply. D.H. made several assertions in testimony before the court, his psychosexual evaluation, parental assessment and Abel screen alleging psychological issues arising from his family of origin, his alcoholic father, his estranged parents, and his treatment for prior psychological depression and possible bipolar disorder. He does not challenge the trial court's findings that he blamed all of his problems on everyone but himself. On the contrary, the clear and convincing proof in this record substantiates the trial court's finding. Regardless of D.H.'s willingness to blame all but himself, the psychological ailments which have yet to be fully diagnosed remained unaddressed by the Department for the duration of these proceedings. We do not suggest that the record clearly and convincingly shows whether D.H. would have benefitted from a more integrated approach to assessing the alleged roots of his chronic joblessness and homelessness– a lack of coping skills, his prior diagnosis and alcohol and drug history as well as possible adult ADD. However, DCS bears the burden of showing that it took reasonable steps to answer that question prior to proceeding with termination.

Instead of satisfying that burden, the state simply cites budgetary concerns as an excuse for the incomplete assessment. Departmental funding concerns did not and should not prevent the initial emergency removal. They should not now be used as an excuse for the substantial delay and ultimate failure in assessing and treating what could be the root causes of the barriers to reunification. We find that DCS failed to meet its burden of showing by clear and convincing evidence that it took reasonable steps to address D.H.'s admitted inability to comply with the parenting plan without assessment or treatment for the conditions identified in the psychological evaluations conducted at the State's behest.

### C.      Polygraphs, Custody and Treatment

In this case, we are not concerned with the admissibility of evidence reflecting the results of a polygraph test administered to D.H. We are, likewise, not concerned with the refusal of a criminal defendant to submit to a polygraph test, either in the guilt phase of his trial or at the sentencing stage. *State v. Pierce*, 138 S.W.3d 820 (Tenn.2004) reiterates the longstanding refusal of the courts of Tennessee in criminal cases to allow in evidence either the refusal of a defendant to take a polygraph test or the results of such polygraph test administered to a defendant. After acknowledging the legislative sanction for the use of polygraph examinations in the treatment and monitoring of sex offenders as provided by Tennessee Code Annotated section 39-13-704(d)(2), the *Pierce* court stated, "the propriety of using polygraph tests in treatment and monitoring programs for sex offenders is not at issue in this case." *Pierce*, 138 S.W.3d at 820 at n.7.

D.H.'s refusal to take the polygraph examination is relevant only because it is part of the psychosexual evaluation that was to be completed by December 31, 2002. What effect, if any, did this failure have on the psychosexual evaluation? In her evaluation report of March 1, 2003, Ms. Hilliard stated:

> 1. Based on the previously noted factors and information available at the time of this evaluation, no complete risk assessment can be completed at this time as [D.H.] failed to submit to a polygraph assessment.. . . If [D.H.] completes a polygraph assessment, more complete recommendations may be submitted.

There is no statutory prohibition in the use of polygraph tests as a part of a psychosexual evaluation in this non-criminal context. The psychosexual evaluation was but a limited part of the total process of evaluation and, in the context of this case, is but a minor factor in determining the question of "reasonable efforts" by DCS.

### D.        The dismissal of the Gonzalez's Petition

The paternal grandparents Gonzalez did not appeal the final judgment in this case. Normally, such would end any inquiry into the rights of Mr. and Mrs. Gonzalez. We are faced, however, with the holding of the Tennessee Supreme Court in their interlocutory appeal in this case wherein it is said:

> Additionally, intervention as of right is not appropriate in this case because there is a party in the underlying suit, the child's father, who may adequately represent the Gonzalezes' interests. Here, Hall has supported the Gonzalezes' motion to intervene, and, presumably, he will vigorously pursue all of the issues the Gonzalezes could raise. Particularly in the context of these cases, where delay is to be avoided, the unnecessary addition of parties and their attendant attorneys may not be allowed where the interests at stake are already adequately represented.
>
> We have reviewed the conclusion of the trial court that the Gonzalezes were not entitled to intervene as of right in the termination proceedings. We agree that the Gonzalezes have failed to demonstrate sufficient grounds for intervention as of right. Accordingly, we affirm he judgment of the trial court.
>
> This ruling, made at this interlocutory stage of the proceedings, does not leave the Gonzalezes without a remedy. They may participate in the termination proceedings as witnesses, they may file a petition for custody or adoption, or they may elect other appropriate options.
>
> Accordingly, the trial court's denial of the motion to intervene is affirmed. This case is remanded to the Davidson County Juvenile Court for further proceedings as may be appropriate. Nothing herein shall be construed as preventing the

Gonzalezes from filing a petition for custody and/or adoption.  The costs of appeal are taxed to the appellants, Joseph and Jean Gonzalez, for which execution may issue if necessary.

*Gonzalez v. State Dept. of Children's Serv.*, 136 S.W.3d 613, 620 (Tenn.2004).

Since the termination of parental rights of D.H. in this case is reversed for failure of DCS to establish reasonable efforts by clear and convincing evidence under Tennessee Code Annotated section 37-1-166(a)(2) and 166(g)(2) and the further fact that the action of the trial court in denying the Gonzalezes' petition was in the context of termination of the parental rights of D.H., we will remand the case to the trial court for further proceedings which will include a reconsideration of the petition of Mr. and Mrs. Gonzalez.  The failure of the Gonzalezes to appeal the final judgment in this case might well have been influenced by the ruling of the Supreme Court on the interlocutory appeal. The safer course is to remand the case without prejudice to the rights of any party.

## III. CONCLUSION

Hovering over this case and permeating the record before this Court is the record made in Michigan as to this husband and wife before A.J.H. was ever born.  Those records from the State of Michigan that appear in the record in this case contain damning allegations against D.H. relative to his alleged status as a suspected perpetrator of sexual abuse of another child.  It is likewise disclosed that all of his prior children have been taken from him in Michigan and that his parental rights as to those children have been terminated by the courts of Michigan.  The proceedings in the case at bar involve only the youngest child, A.J.H., and the burden still rests upon the Department of Children's Services in Tennessee to prove the allegations of the termination petition and to prove those allegations by clear and convincing evidence as to the child A.J.H.  On the record before this Court, DCS has failed to carry its burden of proof, and for reasons stated herein, the judgment of the trial court is reversed and the case remanded to the trial court for further proceedings in conformity with this opinion.  Existing custody arrangements shall continue in effect pending further orders of the trial court.

Costs of the cause are assessed against the State.

_____
WILLIAM B. CAIN, JUDGE

-14-